SHARTSIS FRIESE LLP
ROBERT CHARLES WARD (Bar #160824)
rward@sflaw.com
FELICIA A. DRAPER (Bar #242668)
fdraper@sflaw.com
One Maritime Plaza, Eighteenth Floor
San Francisco, CA  94111-3598
Telephone:    (415) 421-6500
Facsimile:    (415) 421-2922

Attorneys for Plaintiffs

*Additional Attorneys Listed on Signature Page*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALGER CAPITAL APPRECIATION FUND; ALGER MID CAP GROWTH FUND; ALGER HEALTH SCIENCES FUND; ALGER SPECTRA FUND; ALGER DYNAMIC OPPORTUNITIES FUND; ALGER CAPITAL APPRECIATION INSTITUTIONAL FUND; ALGER FOCUS EQUITY FUND; ALGER MID CAP GROWTH INSTITUTIONAL FUND; ALGER CAPITAL APPRECIATION PORTFOLIO; ALGER MIDCAP GROWTH PORTFOLIO; ALGER COLLECTIVE TRUST SPECTRA SERIES; ALGER SICAV - ALGER DYNAMIC OPPORTUNITIES FUND; ALGER SICAV - ALGER AMERICAN ASSET GROWTH FUND; ALGER SICAV - ALGER FOCUS EQUITY FUND; ALGER CAPITAL APPRECIATION SERIES CIT; and ALGER CAPITAL, LLC, | Case No. |
| | **COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| BIOMARIN PHARMACEUTICAL INC.; JEAN-JACQUES BIENAIME; and HENRY J. FUCHS, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ............................................................................. 2

JURISDICTION AND VENUE ........................................................................ 6

DIVISIONAL ASSIGNMENT .......................................................................... 6

PARTIES ........................................................................................................... 7

    I.     Plaintiffs ............................................................................................ 7

    II.    Defendants ......................................................................................... 9

FACTUAL ALLEGATIONS ........................................................................... 10

    I.     BioMarin .........................................................................................10

    II.    BioMarin's Reporting Obligations as a Public Company.................10

    III.   Valrox ..............................................................................................13

    IV.   Valrox's Disparate Clinical Trials ..................................................15

    V.    The FDA's Approval Process ..........................................................27

    VI.   The FDA Begins its Review of Valrox But Privately Warns BioMarin that Its Inspection of the Novato Facility Will Likely Be Delayed .............................31

    VII.  BioMarin Assures Investors that the FDA's Review Is "On Track" and the PDUFA Date "Holding Firm," Despite Months of Silence from the Agency .............................................................33

    VIII. The FDA Raises Issues with Valrox's Durability and Cancels its Inspection of the Novato Facility, Sounding a Final Death Knell for Valrox's Approval .............................................................36

    IX.   The FDA Refuses to Approve Valrox As Two Years of Clinical Trial Data Cast Further Doubt on the Drug's Durability ....................39

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................... 43

    I.     Defendants' False and Misleading Statements about the FDA's Approval of Valrox ..........................................................43

    II.    Defendants' False and Misleading Statements About the Effectiveness of BioMarin's Internal Disclosure Controls and Procedures .....................................53

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

**Page**

SUMMARY OF DEFENDANTS' SCIENTER ........................................................................ 55

PLAINTIFFS' ACTUAL RELIANCE ................................................................................... 58

PRESUMPTION OF RELIANCE ......................................................................................... 59

LOSS CAUSATION ............................................................................................................. 61

NO SAFE HARBOR ............................................................................................................. 64

FIRST CAUSE OF ACTION ................................................................................................ 64

SECOND CAUSE OF ACTION ........................................................................................... 67

THIRD CAUSE OF ACTION ............................................................................................... 68

PRAYER FOR RELIEF ........................................................................................................ 69

JURY DEMAND ................................................................................................................... 69

Case No.                                    COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiffs Alger Capital Appreciation Fund, Alger Mid Cap Growth Fund, Alger Health Sciences Fund, Alger Spectra Fund, Alger Dynamic Opportunities Fund, Alger Capital Appreciation Institutional Fund, Alger Focus Equity Fund, Alger Mid Cap Growth Institutional Fund, Alger Capital Appreciation Portfolio, Alger Midcap Growth Portfolio, Alger Collective Trust Spectra Series, Alger SICAV - Alger Dynamic Opportunities Fund, Alger SICAV - Alger American Asset Growth Fund, Alger SICAV - Alger Focus Equity Fund, Alger Capital Appreciation Series CIT, and Alger Capital, LLC (collectively, "Plaintiffs") are purchasers of the common stock of BioMarin Pharmaceutical Inc. ("BioMarin" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Defendant BioMarin and two of its executive officers, Jean-Jacques Bienaimé ("Bienaimé") and Henry J. Fuchs, M.D. ("Fuchs" and, together with BioMarin and Bienaimé, "Defendants"), and allege the following upon personal information as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which includes, among other things, a review and analysis of: BioMarin's public filings with the United States Securities and Exchange Commission ("SEC"), BioMarin's press releases and public statements, BioMarin's earnings call transcripts and presentations, media and analyst reports concerning BioMarin, documents publicly filed in *In re BioMarin Pharmaceutical Inc. Securities Litigation*, No. 3:20-cv-06719-WHO (N.D. Cal.) (the "Class Action"), and other publicly available documents concerning BioMarin.

Plaintiffs' information and belief is also based on its attorneys' investigation of the former BioMarin employee ("FE 1") referenced in the Class Action complaint. Specifically, Plaintiffs' attorneys reviewed documents publicly filed in the Class Action, including Defendants' Opposition to Lead Plaintiff's Motion for Class Certification (Class Action Dkt. No. 119), the parties' Joint Case Management Statement dated February 7, 2023 (Class Action Dkt. No. 124), and other filings relating to or discussing FE 1 (*see, e.g.*, Class Action Dkt. Nos. 115, 128). In the Joint Case Management Statement submitted to the Court, counsel for Lead Plaintiff vigorously disputed defense counsel's characterization of the allegations relating to FE 1 and represented to

the Court that "[t]he [Class Action] Complaint accurately reports FE 1's statements to [Lead Plaintiff's counsel; counsel will submit sworn declarations explaining that FE 1 was interviewed twice and *each statement* reported in the Complaint was read to, and confirmed by, FE 1." (Class Action Dkt. No. 124 at 8.) Not only did counsel for Lead Plaintiff confirm the accuracy of FE 1's statements, it also represented to the Court that FE 1's statements were supported by information received in discovery: "Indeed, the ***record corroborates*** FE 1's report that the FDA indefinitely postponed its inspection of BioMarin's valrox manufacturing facility in early March." (*Id.* (emphasis in original).) Counsel for Lead Plaintiff reaffirmed to the Court that the statements attributed to FE 1 in the Class Action complaint were accurate during a case management conference held on February 14, 2023. In addition to the information placed before the Court in the Class Action, Plaintiffs' attorneys have independently confirmed FE 1's identity and many of the details about FE 1's employment with BioMarin, including the dates of FE 1's employment and FE 1's title and job responsibilities.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action to recover significant investment losses suffered as a result of numerous false and misleading statements and omissions made by Defendants regarding the Food and Drug Administration ("FDA" or the "Agency")'s review and approval of BioMarin's transformative new drug, valoctocogene roxaparvovec, also known as "Valrox."

2.      Throughout the relevant period, Defendants repeatedly told investors that BioMarin was working closely and collaboratively with the FDA and that the Agency's review was "on track," such that Valrox would be approved and launched in the second half of 2020. Investors were shocked, therefore, when the FDA announced in August 2020 that it was declining to approve Valrox due to concerns that it had regarding the drug's effectiveness and durability. But that result was not a surprise to Defendants, notwithstanding their public comments to the contrary. As

SHARTSIS FRIESE LLP

Defendants have since **admitted**, the FDA had postponed a critical on-site inspection of BioMarin's manufacturing facility and thereafter had "no dialogue whatsoever" with BioMarin about Valrox, save for two perfunctory meetings.

3. Defendants Bienaimé and Fuchs personally profited from their fraud. During the time when they were making material misstatements to investors, they sold off uncharacteristically large amounts of BioMarin stock at prices artificially inflated by their failure to disclose the truth to the market. Meanwhile, investors such as Plaintiffs suffered significant damages as a result of Defendants' fraud.

4. Valrox was the first-of-its-kind gene therapy to treat severe hemophilia A, a genetic bleeding disorder caused by missing or defective Factor VIII, a clotting protein. Without sufficient functioning Factor VIII, individuals with severe hemophilia A are at risk for painful and potentially life-threatening bleeding from even modest injuries. Individuals with severe hemophilia A also experience spontaneous bleeding resulting in progressive and debilitating joint damage.

5. Severe hemophilia A is typically treated with a prophylactic regimen of replacement Factor VIII infusions several times per week. In 2020, the average price of replacement infusions was $700,000 per year.

6. Valrox, on the other hand, is administered through a one-time infusion that delivers a functional gene that enables the body to produce Factor VIII on its own without the need for continued replacement infusions.

7. Because Valrox cannot be readministered, its effectiveness and commercial success were dependent on it providing a durable and long-lasting reduction in bleeding events.

8. Valrox also needed to be durable and long-lasting to justify its seven-figure price tag. In January 2020, Defendant Bienaimé announced that BioMarin would charge between $2 million and $3 million per infusion, making Valrox the most expensive drug in the world. But third-party payors would only pay for Valrox if the drug was durable and long-lasting, making it cost effective when compared to traditional replacement infusions.

9. Initially, Valrox appeared to be effective. In an initial Phase 1/2 clinical trial, patients had Factor VIII levels consistently at or near the normal range for the first three years

SHARTSIS FRIESE LLP

post-infusion.  Although Factor VIII levels declined in the second and third years, they appeared to plateau at a level that was remarkable and previously unheard of for patients with severe hemophilia A.  Significantly, the Valrox administered to patients in the Phase 1/2 clinical trial was manufactured by a third-party laboratory specifically for use in the clinical trial.

10.    Given this success, BioMarin commissioned a Phase 3 clinical trial designed to test Valrox's effectiveness and durability on a larger group of patients.  BioMarin also constructed its own gene therapy facility in Novato, California to produce Valrox for the Phase 3 clinical trial and, if approved by the FDA, consumer production.

11.    Six months post-infusion, the patients in the Phase 3 clinical trial had Factor VIII levels that were approximately *half* those of the patients in the Phase 1/2 clinical trials at the same point in time.  Defendants downplayed the results from the Phase 3 clinical trial and attributed the patients' lower Factor VIII levels to the less frequent use of steroids.  Defendants acknowledged that a difference in manufacturing could have contributed to the lower Factor VIII levels, but assured investors that the Valrox produced at BioMarin's Novato facility was "analytically comparable" and "manufactured on a consistent and reliable basis."

12.    Valrox was designated as an "orphan" drug by the FDA and later, as a "Breakthrough Therapy."  These designations gave BioMarin enhanced access to the FDA during the review and approval process and, if Valrox was approved, seven years of market exclusivity during which it could price and sell the drug however it wanted.

13.    On February 20, 2020, BioMarin announced that the FDA had accepted Valrox's application for priority review and had set an official action deadline date, known as a "PDUFA date," of August 21, 2020.  A drug's PDUFA date is the focus of intense scrutiny for analysts and investors, as it is a "make or break" event for the drug.  Indeed, there are entire websites devoted to calendaring and tracking PDUFA dates and other important milestones in the FDA review process.

14.    Over the next several months, Defendants assured investors that BioMarin was working closely and collaboratively with the FDA and that the Agency's review was on track, including its critical on-site inspection of the Novato facility, such that Valrox would be launched

in the second half of 2020. As Defendants have since **admitted**, BioMarin had "no dialogue whatsoever" with the FDA during the review process save for two perfunctory and statutorily mandated meetings. The FDA also delayed – and eventually cancelled – its critical on-site inspection of BioMarin's Novato facility, making approval of Valrox by the PDUFA date all but impossible. During a "late-cycle" meeting in mid-June 2020, the FDA pointed out discrepancies between the data in the Phase 1/2 and Phase 3 clinical trials and noted that it would be unable to establish the required threshold for Valrox's effectiveness and durability as a result. Defendants withheld this information from investors and continued acting like it was business as usual.

15.    With the PDUFA date fast approaching – but with the market unaware that Valrox could not possibly be approved by then – Defendants Bienaimé and Fuchs sought to profit from BioMarin's stock being artificially inflated by their violations of the securities laws and the common law. First, they offloaded **tens of millions of dollars' worth** of stock. Defendants Bienaimé and Fuchs also caused BioMarin to conduct a private debt offering necessary to pay off $375 million worth of convertible notes that were coming due in full in the fall of 2020.

16.    Just two days before the PDUFA date, Defendants announced that BioMarin had received a Complete Response Letter ("CRL") from the FDA declining to approve Valrox. The FDA denied Valrox's application because the differences between the Phase 1/2 and Phase 3 clinical studies precluded it from establishing durability of effect, just as the FDA had told Defendants months earlier. BioMarin's stock plummeted in response, declining nearly **37%** in the two days following the Company's announcement.

17.    In denying Valrox's application, the FDA recommended that BioMarin submit additional data to provide evidence of the drug's effectiveness and durability. Defendants released that data on January 10, 2021, but it was not as investors or the FDA expected. One and two years post-infusion, the patients in the Phase 3 clinical trial had Factor VIII levels that were a fraction of the patients' in the Phase 1/2 clinical trial at the same points in time. BioMarin's stock declined a further 10% in response.

18.    The effect of Defendants' material misrepresentations and omissions was to artificially inflate the price of BioMarin's common stock.

Case No.                  COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

19. Plaintiffs purchased BioMarin common stock at a time when Defendants – unbeknownst to Plaintiffs – were misrepresenting the FDA's approval of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures.

20. As the truth was slowly revealed to the market and the previously concealed risks materialized, the price of BioMarin common stock plummeted, and Plaintiffs suffered significant losses.

21. Plaintiffs therefore bring this action under the federal securities laws and the common law to recover the investment losses they suffered as a result of Defendants' materially false and misleading statements and omissions of material fact.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

23. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. BioMarin has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

25. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## DIVISIONAL ASSIGNMENT

26. Pursuant to Local Rule 3-2(c) and (d), this action should be assigned to the San Francisco or Oakland Divisions of this Court, as BioMarin's is headquartered in Marin County,

SHARTSIS FRIESE LLP

California. The related Class Action was assigned to the San Francisco Division of this Court.

<div align="center">

**PARTIES**

</div>

**I.**    **Plaintiffs**

27.    Plaintiff Alger Capital Appreciation Fund is a series of The Alger Funds, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Capital Appreciation Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit A.

28.    Plaintiff Alger Mid Cap Growth Fund is a series of The Alger Funds, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Mid Cap Growth Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit B.

29.    Plaintiff Alger Health Sciences Fund is a series of The Alger Funds, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Health Sciences Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit C.

30.    Plaintiff Alger Spectra Fund is a series of The Alger Funds II, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Spectra Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit D.

31.    Plaintiff Alger Dynamic Opportunities Fund is a series of The Alger Funds II, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Dynamic Opportunities Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit E.

32.    Plaintiff Alger Capital Appreciation Institutional Fund is a series of The Alger Institutional Funds, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Capital Appreciation Institutional Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit F.

33.    Plaintiff Alger Focus Equity Fund is a series of The Alger Institutional Funds, a

Case No.                        COMPLAINT & DEMAND FOR JURY TRIAL

Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Focus Equity Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit G.

34. Plaintiff Alger Mid Cap Growth Institutional Fund is a series of The Alger Institutional Funds, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Mid Cap Growth Institutional Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit H.

35. Plaintiff Alger Capital Appreciation Portfolio is a series of The Alger Portfolios, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Capital Appreciation Portfolio purchased BioMarin common stock during the relevant period are set forth in Exhibit I.

36. Plaintiff Alger Midcap Growth Portfolio is a series of The Alger Portfolios, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Midcap Growth Portfolio purchased BioMarin common stock during the relevant period are set forth in Exhibit J.

37. Plaintiff Alger Collective Trust Spectra Series is a series of Alger Collective Trust, a Pennsylvania trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Collective Trust Spectra Series purchased BioMarin common stock during the relevant period are set forth in Exhibit K.

38. Plaintiff Alger SICAV - Alger Dynamic Opportunities Fund is a series of Alger SICAV, a Société d'investissement à capital variable - Grand Duchy of Luxembourg whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger SICAV - Alger Dynamic Opportunities Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit L.

39. Plaintiff Alger SICAV - Alger American Asset Growth Fund is a series of Alger SICAV, a Société d'investissement à capital variable - Grand Duchy of Luxembourg whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger SICAV - Alger American Asset Growth Fund purchased BioMarin common stock during

the relevant period are set forth in Exhibit M.

40.    Plaintiff Alger SICAV - Alger Focus Equity Fund is a series of Alger SICAV, a Société d'investissement à capital variable - Grand Duchy of Luxembourg whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger SICAV - Alger Focus Equity Fund purchased BioMarin common stock during the relevant period are set forth in Exhibit N.

41.    Plaintiff Alger Capital Appreciation Series CIT is a series of Alger Collective Trust, a Pennsylvania trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Capital Appreciation Series CIT purchased BioMarin common stock during the relevant period are set forth in Exhibit O.

42.    Plaintiff Alger Capital, LLC is a Delaware limited liability company whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Capital, LLC purchased BioMarin common stock during the relevant period are set forth in Exhibit P.

43.    At all relevant times, Fred Alger Management, LLC ("Alger") acted as investment adviser to Plaintiffs in connection with their purchases of BioMarin common stock.

## II.    **Defendants**

44.    Defendant BioMarin is a Delaware corporation with its principal place of business located at 770 Lindaro Street, San Rafael, California 94901. BioMarin's common stock is publicly traded in the United States on the NASDAQ under the ticker symbol "BMRN."

45.    Defendant Bienaimé is BioMarin's Chairman and Chief Executive Officer ("CEO"). Bienaimé joined BioMarin in 2005 and was CEO and Chairman of BioMarin's Board of Directors throughout the relevant period.

46.    Defendant Fuchs is BioMarin's President of Worldwide Research & Development. Fuchs joined BioMarin in 2009 and was President of Worldwide Research & Development throughout the relevant period.

Case No.                        COMPLAINT & DEMAND FOR JURY TRIAL

**FACTUAL ALLEGATIONS**

**I.    BioMarin**

47.    BioMarin describes itself as "a global biotechnology company that develops and commercializes innovative therapies for people with serious and life-threatening rare diseases and medical conditions."  BioMarin focuses on products that "represent a significant unmet medical need, have well-understood biology and provide an opportunity to be first-to-market or offer a significant benefit over existing products."

48.    More specifically, BioMarin focuses on developing and commercializing first-to-market "orphan" drugs, or those that treat a rare disease or condition affecting less than 200,000 individuals in the United States.

49.    Because orphan drugs treat such a small population, the federal government offers incentives to pharmaceutical companies to produce them.  To encourage the treatment of rare diseases and conditions, companies developing orphan drugs receive tax credits for qualified clinical trials, exemptions from user fees, and seven years of market exclusivity after the drug is approved.

50.    According to a 2019 study from America's Health Insurance Plans, orphan drugs are 25 times more expensive than non-orphan drugs, with an average annual cost of $123,543. 88% of orphan drugs cost more than $10,000 per year per patient.  Thus, orphan drugs can be hugely profitable for companies, especially during the first seven years of market exclusivity. During this time – when there is no market competition – a company can price an orphan drug however it wants.

**II.    BioMarin's Reporting Obligations as a Public Company**

51.    Under the regulations and guidance promulgated by the SEC, companies whose stock is publicly traded in the United States – such as BioMarin – have important public reporting and disclosure obligations.

52.    Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures – as well as other

Case No.    COMPLAINT & DEMAND FOR JURY TRIAL

public statements made by the company – when determining whether to invest.

53.     The following table sets forth the relevant filings that BioMarin made with the SEC during the relevant period, the date they were filed with the SEC, which of the Defendants signed those filings or their accompanying certifications, and how they are referred to throughout this Complaint:

| Description of the Filing | Date of the Filing | Defendant Signatory to the Accompanying SOX Certification | Abbreviation |
|---|---|---|---|
| Form 10-Q for the quarter ended March 31, 2020 | May 1, 2020 | Bienaimé | "1Q2020 10-Q" |
| Form 10-Q for the quarter ended June 30, 2020 | August 5, 2020 | Bienaimé | "2Q2020 10-Q" |
| Form 10-Q for the quarter ended September 30, 2020 | November 6, 2020 | Bienaimé | "3Q2020 10-Q" |

54.     Public companies like BioMarin are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations.  Members of the company's executive team must be involved in creating and designing these controls and must personally guarantee their effectiveness.

55.     The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework defines an internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance."   With respect to the reporting and compliance aspects of this definition, the Integrated Framework specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations."   *See* The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework § 3

SHARTSIS FRIESE LLP

("Requirements for Effective Internal Control").

56.     Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure assess the effectiveness of such internal disclosure controls and procedures.

57.     Section 302 of SOX requires a public company's CEO to provide a certification concerning his or her review of, and disclosure of information about, the company's internal controls.  Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO is required to certify in each periodic report that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

- he or she and the other certifying officers:

  o are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

  o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

  o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

  o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

SHARTSIS FRIESE LLP

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

  o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 34-46427, § II.A (Aug. 29, 2002) (footnotes omitted).

58.     Defendant Bienaimé provided these disclosure control certifications with BioMarin's 1Q2020 10-Q, 2Q2020 10-Q, and 3Q2020 10-Q.

**III.     Valrox**

59.     At the end of 2019, BioMarin had only nine products in its entire portfolio.  All nine products had been designated as orphan drugs by the FDA, but the seven-year period of market exclusivity had expired for three of them – Aldurazyme, Kuvan, and Naglazyme – and the exclusivity period for a fourth – Vimizim – was set to expire in 2021.

60.     Kuvan and Vimizim were BioMarin's highest grossing products and accounted for approximately 28% and 33%, respectively, of the Company's net product revenue in 2019.  But Vimizim's exclusivity period was soon ending, and other pharmaceutical companies were set to begin marketing and selling generic versions of Kuvan as early as the fourth quarter of 2020.

61.     With nearly two thirds of its revenue under significant and immediate threat from generic competition, BioMarin needed a new blockbuster drug to keep the Company afloat.  Valrox was supposed to be that drug.

62.     Valrox is a gene therapy to treat severe hemophilia A, a condition affecting approximately 1 in 10,000 individuals.  Hemophilia A is a genetic disorder caused by missing or defective Factor VIII, a clotting protein.  When blood vessels are injured, Factor VIII helps

Case No.                          COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

platelets stick together to plug cuts and breaks on the vessels and stop bleeding. Without sufficient functioning Factor VIII, individuals with hemophilia A are at risk for painful and potentially life-threatening bleeding from even modest injuries. Individuals with severe hemophilia A often experience painful and spontaneous bleeding, resulting in progressive and debilitating joint damage.

63. Traditionally, individuals with hemophilia A are treated with a prophylactic regimen of replacement Factor VIII infusions two to three times per week. Even with these prophylactic regimens, many individuals still experience spontaneous bleeding events. In 2020, the average cost of replacement infusions was $700,000 per year.

64. Valrox was designed to be the first-of-its-kind gene therapy for the treatment of severe hemophilia A. Gene therapy is a form of treatment designed to fix a genetic problem by adding a corrected copy of the defective gene. The functional gene then produces the proteins that the body needs, potentially reducing or eliminating the cause of the disease.

65. Valrox is administered through a one-time infusion that delivers a functional gene that enables the body to produce Factor VIII on its own without the need for continued replacement infusions.

66. Gene therapies typically cannot be readministered, so Valrox's effectiveness and commercial success was contingent on it providing a durable and long-lasting reduction in bleeding events.

67. Valrox also needed to be durable and long-lasting to justify its seven-figure price tag. Defendant Fuchs announced in June 2019 that BioMarin would likely charge ***at least $1 million per infusion*** of Valrox. Eventually, Valrox's price tag ***more than doubled***, with Defendant Bienaimé announcing in January 2020 that BioMarin would charge between $2 million and $3 million per infusion, ***making it the most expensive drug in the world***.

68. Valrox thus had the potential to be transformative for BioMarin. As Defendant Fuchs explained in June 2019, if even 3,000 of 117,000 eligible patients received a Valrox infusion the first year the drug was approved, that would be "***almost twice the revenue [BioMarin] was***

*currently experiencing*.  And so the demand size, **the value that Valrox represents is really substantial and transformative for BioMarin**."[1]

69.    Investors and analysts agreed.  J.P. Morgan estimated in a May 2019 report that Valrox alone would generate $1.6 billion in sales for BioMarin, more than its 2018 total Company revenue of $1.5 billion.  Cowen likewise noted in a February 2020 report that "even modest penetration with a price point around $2MM would represent significant revenue, as $1B in sales could be achieved for every 500 adult patients treated."

70.    Given its multi-million-dollar price tag, however, third-party payors would only pay for Valrox if the drug was durable and long-lasting, making it cost effective when compared to the traditional replacement infusions.

71.    As Evercore put it in a February 2019 report, Valrox's durability was the "key question" on which the drug's value proposition depended.  "If the effect isn't durable, the value proposition may be harder to communicate."

IV.    **Valrox's Disparate Clinical Trials**

72.    Before a new drug is approved by the FDA, it must go through a rigorous and expensive regulatory approval process.  Part of this process includes clinical trials, where the drug is tested on humans.  Clinical trials are generally conducted in four phases.  Phase 1 trials test an experimental drug or treatment on a small group of individuals for the first time.  During Phase I trials, clinical researchers evaluate the treatment's safety, determine a safe dosage range, and identify side effects.  In Phase 2 clinical trials, the drug or treatment is given to a larger group of individuals to determine whether it is effective and to further evaluate its safety.  In a Phase 3 clinical trial, the drug or treatment is given to an even larger group of individuals.  During Phase 3 trials, clinical researchers seek to confirm the drug's effectiveness, monitor its side effects, compare it to commonly used treatments, and collect additional information to allow the drug to be used safely.  Phase 4 clinical trials are conducted after a drug or treatment has been approved by the FDA to provide additional information about the drug's risks, benefits, and best use.

---

[1] Unless otherwise indicated, bold and italic emphasis used in quotations throughout this Complaint have been added and did not appear in the original quotation.

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

73.     BioMarin began a Phase 1/2 clinical trial of Valrox in 2015.  The Phase I/II clinical trial was designed to evaluate the safety and efficacy of Valrox in up to 12 patients with severe hemophilia A.  The primary endpoints – or the primary outcomes measured by the Phase 1/2 clinical trial – were to assess Valrox's safety and determine the change in Factor VIII levels 16 weeks after infusion.  The Phase 1/2 clinical trial was a "dose escalation study with the goal of observing an increase in Factor VIII levels."

74.     The normal range of Factor VIII levels in the blood is between 50% and 150%, as calculated based on the number of international units (IU) per milliliter (ml) of whole blood. Individuals with mild hemophilia A have Factor VIII levels between 5% and 40%, individuals with moderate hemophilia A have Factor VIII levels between 1% and 5%, and individuals with severe hemophilia A have Factor VIII levels of less than 1%.

75.     Because Valrox was the first gene therapy that BioMarin ever attempted to design or produce, it did not initially have the manufacturing capabilities to do so in-house.  Accordingly, the patients in the Phase 1/2 clinical trial received a Valrox infusion that had been manufactured by a third-party laboratory specifically for use in the clinical trial.

76.     On March 1, 2016, BioMarin announced that Valrox had been granted an orphan drug designation by the FDA.  If Valrox was ultimately approved, its orphan drug status meant that BioMarin would have seven years of market exclusivity during which it could price and sell the drug however it wanted.

77.     On April 20, 2016, BioMarin reported preliminary data from the Phase 1/2 clinical trial:

Case No.                                   COMPLAINT & DEMAND FOR JURY TRIAL

Table 1:  Summary of 8 Patients Factor VIII Levels at Most Recent Evaluations

| Patient # | Dose* | Most Recent Week of Observation | Percentage Factor VIII activity | Severity of Hemophilia at Latest Measurement** |
|-----------|-------|--------------------------------|--------------------------------|------------------------------------------------|
| 1 | Low | 20 | < 1 | Severe |
| 2 | Medium | 16 | 2 | Moderate |
| 3 | High | 16 | 57 | Normal |
| 4 | High | 8 | 60 | Normal |
| 5 | High | 7 | 8 | Mild |
| 6 | High | 7 | 4 | Moderate |
| 7 | High | 6 | 21 | Mild |
| 8 | High | 5 | 10 | Mild |

78.     Of the six patients who received a high dosage of Valrox, all six improved from severe hemophilia A to either moderate or mild hemophilia A, or had normal Factor VIII levels. All high dose patients experienced increasing Factor VIII levels ranging from between 4% and 60%.  All patients were observed between five and 20 weeks post-infusion.

79.     On July 27, 2016, BioMarin reported additional encouraging results from the Phase 1/2 clinical trial.  Of the now seven patients who received a high dose of Valrox, six had Factor VIII levels over 50%, and the seventh had a Factor VIII level above 10%.  Four of the patients had a mean Factor VIII level of 146% at their 20-week observation.  All patients were observed between 12 and 28 weeks post-infusion.

80.     Defendant Fuchs also announced that, "[b]eginning in mid-2017, a Phase 2b study will seek to evaluate the optimal dose of [Valrox] using Factor VIII expression as the primary endpoint with material from the to-be-commercialized manufacturing process.  If successful, this study could support an accelerated approval given the severe unmet need, the substantial effect and tolerability of the treatment."

81.     BioMarin announced further positive results from the Phase 1/2 clinical trial on January 8, 2017:

SHARTSIS FRIESE LLP

Table 1:  Factor VIII Levels (%) of High Dose Patients* by Visit (N=7)

| Week** | 20 | 24 | 28 | 32 | 36 | 40 | 44 |
|---|---|---|---|---|---|---|---|
| n*** | 7 | 7 | 7 | 6 | 7 | 6 | 2 |
| Median Factor VIII Level**** (%) | 97 | 101 | 122 | 99 | 99 | 115 | 119 |
| Mean Factor VIII Level**** (%) | 118 | 130 | 124 | 122 | 115 | 127 | 119 |
| Range (high, low) | (12, 254) | (16, 227) | (15, 257) | (26, 316) | (31, 273) | (17, 264) | (105, 133) |

82.     Of the seven high dose patients, six of the seven continued to have Factor VIII levels above 50%, while the seventh continued to have a Factor VIII level above 15%.  The mean and median Factor VIII levels were all consistently within the normal range between 20 and 44 weeks after infusion.  All patients were observed between 34 and 50 weeks post-infusion.

83.     Defendant Fuchs touted the Phase 1/2 clinical trial's success, remarking that BioMarin was "proud that we have been successful in establishing a leadership position in gene therapy for the most common form of hemophilia, and we are intent on initiating potentially registration enabling trials to provide patients with a new treatment option . . . [t]o see data that shows a 91 percent drop in the mean annualized bleeding rate and a 98 percent drop in prophylactic infusions coupled with mean and median Factor VIII expression levels in the normal range opens up an exciting treatment possibility for hemophilia A patients."

84.     BioMarin announced additional results from the Phase 1/2 clinical trial on July 11, 2017:

Table 1:  Factor VIII Levels (%) of 6e13 vg/kg Dose Patients* by Visit (N=7)

| Week** | 20 | 24 | 28 | 32 | 36 | 40 | 44 | 48 | 52 |
|---|---|---|---|---|---|---|---|---|---|
| 6e13 vg/kg Dose | | | | | | | | | |
| N*** | 7 | 7 | 7 | 6 | 7 | 7 | 7 | 7 | 7 |
| Median Factor VIII Level**** (%) | 97 | 101 | 122 | 99 | 99 | 111 | 105 | 105 | 89 |
| Mean Factor VIII Level**** (%) | 118 | 129 | 123 | 122 | 116 | 124 | 122 | 106 | 104 |
| Range (low, high) | (12, 254) | (12, 227) | (15, 257) | (26, 316) | (31, 273) | (17, 264) | (20,242) | (23,196) | (20, 218) |

85.     For the seven high dose patients, the median and mean Factor VIII levels continued to be above 50% and were all consistently in the normal range from 20 weeks through 52 weeks post-infusion.  All high dose patients were observed one year after infusion.

86.     Given this encouraging data, Defendant Fuchs announced that BioMarin was "moving into a Phase 3 registrational study for [Valrox] gene therapy at the [high dose].  [Valrox] has demonstrated an unprecedented result in potentially shifting severe hemophilia A patients to the normal range of Factor VIII expression, which is consistent with someone who has no disease."  The Phase 3 study was set to begin in the fourth quarter of 2017.

87.     BioMarin also announced that it had "designed and constructed its first gene therapy manufacturing facility located in Novato, California.  Good Manufacturing Practices (GMP) of [Valrox] is anticipated to commence imminently to support ongoing clinical development activities and if approved, commercial demand."  This meant that the Novato manufacturing facility would produce Valrox for both the Phase 3 clinical trial and, if the drug was approved, larger commercial distribution.

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

88.     Despite BioMarin's complete lack of experience in manufacturing gene therapies, it constructed the Novato facility in under a year.  BioMarin admitted that it was able to do so only because of certain "accelerating elements," including "speed of site selection, rapid assembly of critical project teams and engineering resources, co-location of all project teams on site, phased design methodologies, construction and buildout concepts and concurrent commercial process scale-up."  Indeed, BioMarin's Executive Vice President of Technical Operations admitted that the buildout of the Novato facility was a "logistical challenge" and that the Company "started off with very little expertise and capabilities within the company from a [gene therapy] perspective."

89.     Nevertheless, BioMarin assured investors that the Novato facility had a "robust vector manufacturing process" that was "developed in accordance with International Conference on Harmonisation guidance for Pharmaceuticals for Human Use facilitating worldwide registration with health authorities."

90.     On October 18, 2017, BioMarin announced that the FDA had completed its review of the Company's Investigational New Drug ("IND") application and concluded that it could proceed.  The FDA's decision was based on the 52-week data from the Phase 1/2 clinical trial and the protocol for the Phase 3 clinical trial.

91.     Two weeks later, BioMarin announced that the FDA had granted Valrox a "Breakthrough Therapy" designation, which is designed to facilitate and expedite the development and review of new drugs that address an unmet medical need in the treatment of a serious condition.

92.     The designation of Valrox as a Breakthrough Therapy was significant because it granted BioMarin unparalleled access to the FDA.  Among other things, BioMarin would be given "[i]ntensive guidance on an efficient drug development program," and "[o]rganizational commitment involving senior [FDA] managers."  The FDA would also "hold[] meetings with [BioMarin] and the review team throughout the development of the drug," "provid[e] timely advice to, and interactive communication with, [BioMarin] regarding the development of the drug," assign[] a cross-disciplinary project lead for the FDA review team to facilitate an efficient review of the development program and to serve as a scientific liaison," and "involv[e] senior manager and experienced review staff, as appropriate, in a collaborative, cross-disciplinary

SHARTSIS FRIESE LLP

1   review."

2   93.    With respect to the Phase 3 clinical trial, BioMarin disclosed that it would include

3   approximately 40 patients for a one-year study, and that the Company would file for FDA approval

4   of Valrox using the data from the Phase 3 clinical trial.  "BioMarin expects to initiate the global

5   Phase 3 program in the fourth quarter of 2017, complete enrollment of the last patient by the end

6   of 2018, and provide top-line Phase 3 data by the end of 2019."  The primary endpoint of the Phase

7   3 study was – like the Phase 1/2 study – to measure the change in Factor VIII levels following

8   Valrox infusion.  Lastly, BioMarin disclosed that it had begun producing Valrox at its Novato

9   facility.

10  94.    On December 9, 2017, BioMarin announced updated results from the Phase 1/2

11  clinical trial:

Factor VIII Levels (%) of 6e13 vg/kg Dose Patients* by Visit (N=7) at Nov. 16, 2017 data cut

| Week** | 20 | 24 | 28 | 32 | 36 | 40 | 44 | 48 | 52 | 65 | 78 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6e13 vg/kg Dose | | | | | | | | | | | |
| N*** | 7 | 7 | 7 | 6 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Median Factor VIII Level**** (%) | 97 | 101 | 122 | 99 | 99 | 111 | 105 | 105 | 89 | 98 | 90 |
| Mean Factor VIII Level**** (%) | 118 | 129 | 123 | 122 | 116 | 124 | 122 | 106 | 104 | 93 | 89 |
| Range (low, high) | (12, 254) | (12, 227) | (15, 257) | (26, 316) | (31, 273) | (17, 264) | (20,242) | (23,195) | (20, 218) | (16,145) | (11,179) |

25  95.    Once again, for the seven high dose patients, the median and mean Factor VIII

26  levels were all consistently in the normal range from 20 weeks through 78 weeks after infusion.

27  At 78 weeks post-infusion, the median and mean Factor VIII levels were 90% and 89%,

28  respectively.

- 21 -

SHARTSIS FRIESE LLP

96.     BioMarin began the Phase 3 clinical trial on December 19, 2017, and a few months later, all patients received a Valrox infusion manufactured from the Company's Novato facility.

97.     As Defendant Bienaimé explained, producing Valrox at the Novato facility "not only ensures predictable and consistent supply of Valrox to support our global registrational programs, but reduces the development risks, and speeds time to market."

98.     On May 22, 2018, BioMarin announced additional results from the Phase 1/2 clinical trial:



**MEAN FVIII ACTIVITY LEVELS SETTLING IN NORMAL RANGE (6e13 VG/KG)**

- **No FVIII activity above upper limit of normal at year 2**

The upper and lower box bounds represent 25th and 75th percentiles. The whisker lines represent the minimum and maximum values.    8

99.     For weeks 20 through 104, the seven high dose patients had Factor VIII levels "consistently within the normal or near normal range," but no patient was above the upper limit of normal at week 104.    At 104 weeks post-infusion, the median and mean Factor VIII levels were 59% and 46%, respectively.    The Company maintained that these Factor VIII levels were "consistent with other clinical and pre-clinical reports" and that Valrox had the ability to "transform the standard of care" for individuals with hemophilia A.    BioMarin also assured investors that Valrox delivered "durable expression":

SHARTSIS FRIESE LLP



100.    Lastly, BioMarin announced that it was amending the Phase 3 protocol to evaluate Valrox's superiority when compared to traditional Factor VIII replacement infusions and that its sample size had been increased from 40 patients to 130 patients.

101.    A few months later, on August 2, 2018, BioMarin suggested to investors that it would likely be applying for accelerated approval of Valrox based on new guidelines from the FDA. Defendant Fuchs explained that the new guidelines "are very supportive of our Valrox study design and approval pathways. The recommendation for [Factor VIII] activities in the normal reach on an accelerated approval raises the bar for results outside that range and gives us an important competitive advantage." Defendant Fuchs went on to say that the "draft FDA guidelines along with our commercial scale manufacturing capabilities gives us greater confidence in our prospects with Valrox. We are more encouraged than ever that we've chosen the right path . . . . In addition, we're aligning well with U.S. health authorities and we're very encouraged by our ongoing conversations and development planning with the EU regulatory parties."

102.    Defendant Fuchs made similar representations to investors on October 25, 2018, stating, "we believe the recent draft FDA guidance for the development of gene therapy products [is] supportive of our Valrox study design and approval pathway. The recommendation for factor activity – factor read activity in the normal range – to file with the FDA for an accelerated approval

SHARTSIS FRIESE LLP

raises the bar for results below that range and gives us an important competitive advantage.  Recent discussions with health authorities increases our confidence in our plans to potentially expedite registration."

103.    Defendant Fuchs also told investors that BioMarin had been in frequent contact with the FDA regarding Valrox.  In response to a question from Barclays Capital analyst Gena Wang about accelerated approval, Defendant Fuchs said that, based on "subsequent interactions that we've had with the FDA, the primary decision on approval is going to be based on net benefits and risks in the principal Phase 3 population . . . ."

104.    Defendants maintained their confident tone during a February 21, 2019 conference call, reminding investors that "it is important to remember what has been accomplished.  Durability control for severe hemophilia A patients was an inconceivable concept only a couple of years ago and that has exactly been what's demonstrated the Valrox safety study today."

105.    In response to a question from Bank of America analyst Aspen Mori, Jeffrey Ajer, BioMarin's Executive Vice President and Chief Commercial Officer, once again emphasized that the Company was in close communication with the FDA about Valrox and what was necessary for accelerated approval, stating that they had "good clear discussion with the FDA about that."

106.    Finally, on May 28, 2019, BioMarin released additional results from the Phase 1/2 clinical trial and preliminary results from the Phase 3 clinical trial.  With respect to the Phase 1/2 clinical trial:

|  | Year 1** | Year 2** | Year 3** |
|---|---|---|---|
| **Mean (Median)** Factor VIII Activity Levels (IU/dL) as Measured using Chromogenic Substrate Assay | 64.3 (60.3) | 36.4 (26.2) | 32.7 (19.9) |
|  |  |  |  |
| **Mean (Median)** Factor VIII Activity Levels (IU/dL) as Measured using One-Stage Assay | 103.8 (88.6) | 59.0 (45.7) | 52.3 (29.8) |

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

107.    Three years after infusion, the seven high dose patients had mean and median Factor VIII levels of 52% and 30%, respectively, as measured using a one-stage assay.  BioMarin also reported mean and median Factor VIII levels for the seven high dose patients as measured using a chromogenic substrate assay of 33% and 20%, respectively.

108.    Though the Factor VIII levels had declined in the second and third years after infusion, BioMarin assured investors that it was now approaching a "plateau."  According to Defendant Fuchs, "we've now observed that maintenance of factor expression is a function of expression level and time.  Therefore, by three years post a one-time infusion of [Valrox], we anticipate we are nearing the plateau of expression.  More conservative statistical modeling anticipates that bleeding control will be maintained for at least eight years after gene transfer.  This is fantastic news for the hemophilia community."

109.    With respect to the Phase 3 clinical trial:



110.    The twenty patients in the Phase 3 clinical trial – all of which received the same high dose of Valrox as the patients in the Phase 1/2 clinical trial, though manufactured at BioMarin's Novato facility, not a third-party laboratory – had mean and median Factor VIII levels of 36% and 33%, respectively, as measured using a chromogenic assay between 23 and 26 weeks

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

after infusion.  Comparatively, the patients in the Phase 1/2 clinical trial had mean and median

Factor VIII levels of 68% and 57%, respectively, as measured using a chromogenic assay between

23 and 26 weeks after infusion – *almost double* that of the Phase 3 patients:



BiOMARIN                                          Valoctocogene Roxaparvovec Phase 2 results

**3 Year Phase 2 6e13 vg/kg Data Demonstrates Durable Factor VIII Expression**

Rate of FVIII decline continued to be expression level dependent, slowed in year 3, and appears to be approaching plateau

| FVIII activity level (IU/dL) time point | Mean (Chromogenic) | Median (Chromogenic) | Mean (One Stage) | Median (One Stage) |
|---|---|---|---|---|
| Weeks 23-26 | 68 | 57 | 127 | 100 |
| Week 52 | 64 | 60 | 104 | 89 |
| Week 104 | 36 | 26 | 59 | 46 |
| Week 156 | 33 | 20 | 52 | 30 |

111.    Moreover, three of the twenty patients in the Phase 3 study did not respond to

treatment at all, failing to achieve a Factor VIII level above 5%.

112.    Despite the Phase 3 patients' lower Factor VIII levels and the failure of some to

even respond to Valrox, BioMarin announced that the clinical study had "achieved pre-specified

clinical criteria for regulatory review in the U.S. and Europe."

113.    During a conference call that day, Defendant Bienaimé told investors that, based

on the results of the Phase 1/2 and Phase 3 clinical studies, BioMarin would be filing for

accelerated approval of Valrox and could "potentially get the product approved in the third quarter

of [2020]."

114.    In response to a question from J.P. Morgan analyst Cory Kasimov, Defendant Fuchs

admitted that patients in the Phase 3 clinical study had Factor VIII levels "a little bit lower than

what we observed in the Phase 1/2 study."  Defendant Fuchs also acknowledged that "it's possible

that there are very subtle characteristics of the product which have shifted [the] dose response a

little bit to the left."  Nevertheless, Defendant Fuchs assured investors that the Valrox produced at

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

BioMarin's Novato facility and administered to the Phase 3 patients "appears by all inspection to be analytically comparable" and was "manufactured on a consistent and reliable basis."

115.    Later in the conference call, Defendant Bienaimé speculated that the difference in Factor VIII levels between the patients in the Phase 1/2 and Phase 3 clinical studies might be attributable to a change in steroid use.  He explained that, in the Phase 1/2 clinical study, steroids were administered to all patients, but in the Phase 3 clinical study, patients only received steroids if they had certain elevated enzyme levels.

116.    Despite the disparate results between the Phase 1/2 and Phase 3 clinical trials, BioMarin announced on July 8, 2019, that "based on recent meetings with health authorities in the U.S. and Europe, the company plans to submit marketing applications to both the U.S. Food and Drug Administration (FDA) and the European Medicines Agency (EMA) in 4Q 2019 for its investigational gene therapy, [Valrox], for adults with severe hemophilia A.  These submissions will be based on the updated three-year Phase 1/2 data and the recently completed Phase 3 interim analysis of patients treated with material from the to-be-commercialized process.  Both submissions are expected to represent the first time a gene therapy product for any type of hemophilia will be reviewed for marketing authorization by health authorities."

**V.    The FDA's Approval Process**

117.    To market a new drug in the United States, applicants must submit either a New Drug Application or a Biologics Application ("BLA") to the FDA.  New Drug Applications generally govern traditional small molecule drugs, while BLAs govern biological products that act as a virus, toxin, vaccine, or therapeutic serum – like Valrox.

118.    The FDA's review generally consists of six steps:

SHARTSIS FRIESE LLP

Case No.                     COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP



**Overview of the NDA/BLA Review Process and Major Steps for Completing the Review**

Note: The timeline for review of NMEs/BLAs under PDUFA V's "Program" Review extends the *Conduct Review* Phase by two months.
See Appendix A for a timeline diagram for PDUFA V.

119.    Once an application is accepted, the Prescription Drug User Fee Act ("PDUFA") requires the FDA to take official action within 6 months for applications granted priority review and within 10 months for standard review.  This deadline is known as the "PDUFA date."

120.    A drug's PDUFA date is the focus of intense scrutiny for analysts and investors, as it is a "make or break" event for the drug.  Indeed, there are entire websites devoted to calendaring and tracking PDUFA dates and other important milestones in the FDA review process.

121.    Once an application is received by the FDA, it schedules internal filing and planning meetings to determine whether the application is sufficiently complete as to permit a substantive review and, if so, to organize review tasks and establish an internal review timeline. For priority applications, the filing and planning meetings must be held within 30 days of the application date.

122.    After the filing and planning meetings, the FDA begins its in-depth review of the drug's data and labeling.  An internal mid-cycle meeting must be held within 3 months of the application acceptance date for priority applications.  During the mid-cycle meeting, the FDA's

review team presents the status of the application and all key findings, identifies any issues that could preclude the application from being approved, begins a high-level discussion of labeling, and, if necessary, revises the review plan and interim timelines, among other things. FDA guidance explains that the mid-cycle meeting "should identify showstoppers, roadblocks, key issues, and, if needed, a possible path forward."

123.    Within two weeks of the mid-cycle meeting, the FDA's review team contacts the applicant to provide an update on the status of the review. During this mid-cycle communication, the FDA updates the applicant on any significant issues identified to date, any new information requests, information regarding major safety concerns, the preliminary thinking regarding risk management, proposed dates for the late-cycle meeting, and other projected milestones, among other things.

124.    Approximately one to two weeks after the mid-cycle meeting, the FDA conducts an internal labeling planning meeting to discuss high-level labeling concepts and major issues, and to agree on a schedule and framework for the labeling review process and future labeling meetings. The FDA begins its in-depth labeling review shortly after the labeling planning meeting. Draft labeling, including the FDA's rationale for major changes requiring explanation, is sent to the applicant approximately five months after the application acceptance date for priority applications. The applicant has one week to respond to the draft labeling. FDA guidance describes the development of final labeling as an "iterative" process between the applicant and the FDA; each may submit changes available for review by the other. As explained in the FDA's Standard Operating Policy and Procedures, "[p]roper labeling of licensed and approved products is a requirement of the Food, Drug and Cosmetic Act (FD&C Act) and the Public Health Service Act (PHS Act)," so an open dialogue between the FDA and the applicant is absolutely crucial in the second half of the review process.

125.    At the same time, the FDA conducts a series of on-site inspections for Good Laboratory Practice ("GLP"), Good Clinical Practice ("GCP") and Good Manufacturing Practice ("GMP"). Any manufacturing site that has not previously been inspected by the FDA must be inspected during the review process. For priority applications, all inspections should occur within

SHARTSIS FRIESE LLP

six months of the application acceptance date.  This timeline ensures that at least two months are available at the end of the review process for the applicant to remedy any deficiencies.  The FDA must also complete a lengthy establishment inspection report, which must be approved by its Office of Compliance prior to an application's approval.

126.    The FDA also works with the applicant on post market requirements ("PMRs") and post market commitments ("PMCs"), which occur after a drug is approved.  Like labeling, the establishment of PMRs and PMCs is an iterative process that includes applicant input.

127.    The FDA generally communicates any issues or deficiencies to an applicant by way of "Discipline Review" letters.  All Discipline Review letters are sent in advance of a late-cycle meeting so that the applicant has preliminary notice of any issues or deficiencies.

128.    One of the last steps in the FDA's review process is a late-cycle meeting with the applicant.  The late-cycle meeting generally occurs no later than two months before the PDUFA date. The purpose of the late-cycle meeting is to discuss the status of the review, share information, identify deficiencies, and plan for the remainder of the review.  For priority applications, the FDA must provide the applicant with a background package no later than two business days prior to the late-cycle meeting.  The background package should include an agenda, list of attendees, a current assessment of the need for any risk evaluation and mitigation strategies, and a brief memorandum from the review team outlining any Discipline Review letters and substantive application issues not included in a Discipline Review letter.  All topics identified in the background package should be discussed at the late-cycle meeting, in addition to any outstanding information requests, major labeling issues, and the status of inspections.

129.    An internal wrap-up meeting is held no later than five months after the application acceptance date for priority applications.  The purpose of the wrap-up meeting is to facilitate the development of a comprehensive understanding of the safety, efficacy, and quality of the drug and a preliminary decision on regulatory action.

130.    Finally, the FDA prepares an official action letter and action package that communicates the Agency's final decision to the applicant.  If the FDA does not approve the drug,

Case No.                          COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

it sends the applicant a CRL, which outlines the deficiencies found by the review team and recommendations for corrective action.

## VI. The FDA Begins its Review of Valrox But Privately Warns BioMarin that Its Inspection of the Novato Facility Will Likely Be Delayed

131.    On December 23, 2019, BioMarin announced that it had submitted a BLA to the FDA for Valrox.  "Subject to completion of the FDA's filing review, BioMarin anticipates the BLA review to commence in February 2020."  The BLA was based on the data from both the Phase 1/2 and Phase 3 clinical trials and, according to BioMarin, was the first marketing application for a gene therapy product for any type of hemophilia in the United States.

132.    On February 20, 2020, BioMarin announced that the FDA had accepted Valrox's BLA for priority review and had set a PDUFA date of August 21, 2020.

133.    The Class Action complaint contains allegations made by FE 1.  As set forth above, Plaintiffs' counsel has conducted an independent investigation to confirm the veracity of these allegations, including by determining the identity of FE 1 and reviewing Lead Plaintiff's counsel's representations to the Court that FE 1 made the statements attributed to him in the Class Action complaint and that there is additional support for these allegations in the record.  The following allegations concerning FE 1 are drawn from the Class Action complaint.

134.    According to FE 1, during the first quarter of 2020, the FDA warned BioMarin that its inspection of the Novato facility would be delayed beyond the second quarter of 2020, thus making the Agency's approval of Valrox by the August 21 PDUFA date highly unlikely.  Indeed, Valrox's launch was ***dependent*** on the FDA's inspection of BioMarin's Novato facility.  FE 1 was a Senior Director of Business Development and Strategy at BioMarin from April 2018 until July 2020 and approximately 25% of his time was devoted to Valrox.  According to FE 1, in late February or early March of 2020, before the widespread shutdowns related to COVID-19, the FDA held a meeting with BioMarin during which the Agency provided "concrete feedback" concerning the Valrox BLA.  Brinda Balakrishnan, Senior Vice President and BioMarin's Chief Business Development Officer and one of Defendant Bienaimé's direct reports, informed FE 1 that, during the pre-pandemic meeting, the FDA told BioMarin that the preapproval inspection of the

SHARTSIS FRIESE LLP

Company's Novato facility would likely be delayed beyond the second quarter of 2020, seriously jeopardizing the Agency's ability to approve Valrox by the August 21 PDUFA date. FE 1 confirmed BioMarin's understanding that the inspection of its Novato facility was a necessary precondition for the FDA's approval of Valrox. According to documents publicly filed in the Class Action, FE 1's account of BioMarin's pre-pandemic meeting with the FDA has been corroborated by other record evidence.[2]

135.    FE 1 reported that, as the August 21 PDUFA date drew closer, the FDA's failure to perform the preapproval inspection continued to generate anxiety inside BioMarin. FE 1's colleagues in both research and development and in manufacturing expressed concern, particularly after April 2020, that the FDA had failed to move the Valrox Chemistry, Manufacturing, and Controls review forward. Indeed, FE 1 stated that he was "very surprised" when Defendants Bienaimé and Fuchs told investors in August 2020 that the Valrox BLA was on track when, in truth, the preapproval inspection had not occurred and the Company had received no subsequent communication from the FDA on this and other critical issues, including labeling.

136.    On March 3, 2020, Defendant Bienaimé presented at the Cowen Annual Healthcare Conference on behalf of BioMarin. During the presentation – and despite the fact that the FDA had warned BioMarin just days earlier that its inspection of the Novato facility would likely be delayed beyond the second quarter – Defendant Bienaimé told investors that the Company "*anticipate[d] launching [Valrox] in the second half of [2020]*." Launching Valrox in the second half of 2020 would be impossible if, as the FDA said, it would be unable to inspect the Novato facility until the third quarter of 2020.

137.    In response to a question from Cowen analyst Phil Nadeau about whether there were "any areas of major disagreement between BioMarin and the [FDA], whether its in clinical data, clinical trial design or manufacturing?" Defendant Bienaimé emphasized BioMarin's close relationship with the Agency, stating:  "[s]o since we have had breakthrough – we had breakthrough therapy designation, accelerated filing, priority review *we had a lot of interaction*

---

[2] Defendants have produced more than 230,000 pages of documents from more than 20 custodians in the Class Action.

Case No.                          COMPLAINT & DEMAND FOR JURY TRIAL

*with the FDA over the past few years.* And I would say on the clinical front, as of today, I'm not aware of any substantial discussion going on in the [Chemistry, Manufacturing, and Controls] front. There are some discussions, but *we have been cooperating very closely with the FDA over the past three years*. Actually, when we designed this manufacturing facility we interacted with them. *We've been interacting with them very closely* on the development of in-process assay or release assay. *So we believe [we have a] very good relationship with them*."

138.    The FDA held its mid-cycle meeting with BioMarin in mid-April 2020. Astoundingly – but unbeknownst to investors at the time – *BioMarin did not have a single conversation with the FDA for the next two months*. This was a drastic reversal from BioMarin's previous interactions with the FDA, especially given Valrox's designation as a Breakthrough Therapy.

139.    During this time, the FDA should have been communicating with BioMarin about Valrox's labeling, scheduling the on-site inspection of the Novato facility, and working with the Company on PMRs and PMCs.   Yet BioMarin heard nothing from the FDA, and told investors the precise opposite.

**VII.    BioMarin Assures Investors that the FDA's Review Is "On Track" and the PDUFA Date "Holding Firm," Despite Months of Silence from the Agency**

140.    On April 29, 2020, BioMarin held a conference call announcing its financial results for the first quarter of 2020 (the "1Q2020 Earnings Call").   During the call, SunTrust analyst Robyn Karnauskas asked Defendants "what gives you confidence that . . . there won't be any more delays" in Valrox's approval?   Defendant Fuchs responded:   "*[t]he confidence from the FDA is that we're tracking to our milestones.  And in some cases, they are accelerating their work.  So having been through a bunch of these recently, all the signs are pointing favorably*."   Defendant Fuchs further stated that "*the FDA is committed to meet the August PDUFA action date*."

141.    A few weeks later, on May 14, 2020, Defendants Bienaimé and Fuchs presented at the Bank of America Global Research Health Care Conference on behalf of BioMarin.   During the presentation, Bank of America analyst Geoffrey Meacham asked Defendants Bienaimé and Fuchs about Valrox's "launch in the context of social distancing [and] telemedicine?"   Defendant

SHARTSIS FRIESE LLP

Bienaimé responded that BioMarin had "***done a lot of meetings with, of course, regulatory authorities, we are doing a lot of interactions . . . nobody [is] concerned about launching it in this situation [but] at the same time, we're not launching the drug today, PDUFA date is late August, so we'[ll] likely be launching in early September in the U.S.***"

142.    Meacham then asked Defendants Bienaimé and Fuchs "where you are with respect to [Chemistry, Manufacturing, and Controls]?  And, from a manufacturing perspective, what gives you the confidence in the ultimate outcome here with respect to an inspection?  Maybe just help us with . . . the inspection and the manufacturing facility?"

143.    Defendant Bienaimé responded that "***the inspection by the FDA is scheduled significantly before the PDUFA date.  So, we are on track in this respect.  I would say what makes us confident [is] . . . based on all of our interactions we've had over the past 3 years or so, interacting with the FDA as we were building the plant, validating the plant, makes us already be confident that we're going to be in a good position with the FDA inspection***."  Defendant Fuchs went on to state that "***we're pretty close to the finish line at this point***."

144.    A few days later, on May 19, 2020, Defendant Fuchs presented at the RBC Capital Markets Global Healthcare Conference on behalf of BioMarin.  During the presentation, Defendant Fuchs stated that, "***[o]n the horizon later this year, we're looking forward to the potential approval of [Valrox] for the treatment of hemophilia A, our PDUFA action date of August 21 is holding firm.  In spite of the pandemic, everything is going quite well, in review with the FDA***."

145.    Later on in the presentation, Defendant Fuchs stated that BioMarin was "***on track in the PDUFA action cycle and feeling good about where we are***" and that the Company was in a "***late-stage regulatory process***" with Valrox.

146.    Defendants capitalized on the positive buzz and investor excitement that Valrox was generating to complete a $585.8 million private debt offering on May 19, 2020.  Given the impact of the COVID-19 pandemic on BioMarin's revenue, completing the debt offering on favorable terms was of paramount importance because the Company had $375 million of convertible notes due in full in the fall of 2020 and expected meaningful disruptions to its business

Case No.                       COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

for the remainder of the year.

147. On May 31, 2020, BioMarin announced that the "*inspection of the [Novato] facility by [the] FDA is expected to be complete during the second quarter [of 2020], which would allow for potential licensure of the facility in the U.S. consistent with the August 21 PDUFA date.*"

148. On June 4, 2020, Defendants Bienaimé and Fuchs presented at the Jefferies Global Healthcare Conference on behalf of BioMarin. During the presentation, Defendant Bienaimé told investors that "*[w]e anticipate the US approval of [Valrox], the first ever gene therapy treatment in any hemophilia indication, in the second half of this year based on our August 21 PDUFA date with the FDA.*"

149. Jefferies analyst Eun Yang then asked Defendants Bienaimé and Fuchs about the inspection of BioMarin's Novato facility, stating: "[y]ou also mentioned that [BioMarin is] on track for [the] FDA's inspection in the second quarter, and we have less than a month left. So has a date been set up?"

150. Defendant Fuchs responded: "*Yes. We have a schedule. And in fact, the agency has been quite collaborative.* Inspections are part document review and part inspection onsite. So they accommodated a suggestion that we made, which was to start the document review already. So we shipped them a whole bunch of documents, and they've begun their reviews. And I think that will make their on-site inspection just that much more efficient. Now, we have to pay attention to travel and stuff like that. *And our working belief and the agency has signaled strongly that they intend to maintain their PDUFA action date. And so far, the kind of flexibility we've seen from the agency would suggest that whatever problems they experienced are going to work around.*"

151. On June 9, 2020, Defendants Bienaimé and Fuchs presented at the Goldman Sachs Annual Healthcare Conference on behalf of BioMarin. During the presentation, Defendant Bienaimé again stated that "*[w]e continue to anticipate the U.S. approval of [Valrox] in the second half of the year based on our August 21 PDUFA action date.*"

152. Goldman Sachs analyst Salveen Richter then asked Defendants Bienaimé and Fuchs "as you near this August 21 PDUFA date, could you comment on what gating factors are -

SHARTSIS FRIESE LLP

- still are there ahead of the PDUFA and commercialization?  With regard to the [Novato] facility, we know its pending FDA inspection.  So are there any alternative ways, I guess, for the FDA to certify that plant via virtual means?"

153.     In response, Defendant Fuchs stated:  "Well we're in the middle of a mesh with the FDA.  Any given day, it's like back and forth.  ***But what I would say is that in regards to major metrics, the agency is actually ahead of their PDUFA mandated regulatory metrics in terms of timeline***.  So really, what remains are inspections and completion of reviews.  They have all the information on file that they need to complete their reviews.  ***And so we're working very closely with them to keep things on track.  . . . So we continue the collaboration***."

154.     Defendants' statements could not have been further from the truth.  BioMarin had ***not*** been working collaboratively with the FDA, a date had ***not*** been set for the on-site inspection of the Novato facility, and the FDA's review was ***not*** close to the finish line.  As such, there was ***no*** basis for Defendants to tell investors that Valrox would be approved by the August 21 PDUFA date or launch in the second half of 2020.

## VIII.   The FDA Raises Issues with Valrox's Durability and Cancels its Inspection of the Novato Facility, Sounding a Final Death Knell for Valrox's Approval

155.     By June 21, 2020, at the absolute latest, the FDA held its late-cycle meeting with BioMarin.  Defendants have since admitted – though they concealed this information from investors at the time – that, during the late-cycle meeting and in the late-cycle background package, the FDA questioned Valrox's durability, just as investors had more than a year earlier.

156.     Defendant Fuchs explained in September 2020 – weeks after the FDA issued the CRL – that the FDA pointed out in writing and during the late-cycle meeting the differences in Factor VIII levels between the patients in the Phase 1/2 and Phase 3 clinical trials.  "[T]hey made note of the trajectory of the future of Factor VIII expression and they made note of the thresholds."  "During the late-cycle meeting, [the FDA] observed this trajectory, the difference between the Phase 2 and Phase 3 material."  Given Valrox's trajectory, the FDA told BioMarin that it was unable to establish the required threshold for Valrox's effectiveness and durability necessary for approval.  The FDA also asked BioMarin whether Valrox was "going to wear off?  Is there a

SHARTSIS FRIESE LLP

1   threshold level where a patient should revert to prophylactic therapy?"

2   157.   Given the FDA's questions and the disparate results from the Phase 1/2 and Phase
3   3 clinical trials, BioMarin asked the FDA for reassurances about Valrox's approval.  The FDA
4   refused, saying only "[h]ere's what we found."

5   158.   Even worse, the FDA informed BioMarin during the late-cycle meeting that it was
6   definitively cancelling its on-site inspection of the Novato facility.  As Defendant Fuchs later
7   admitted, "they changed their plans sensibly related to COVID.  And so we then went into a big
8   scramble . . . we were going crazy.  And we -- this whole Opus Magnus about how they could
9   virtually inspect us or use different inspectors, bunch of stuff . . . [a]nd we could never get any
10  traction on that discussion."

11  159.   As with the mid-cycle meeting, after the late-cycle meeting, ***BioMarin did not hear***
12  ***from the FDA again for two months***.  As Defendant Fuchs later admitted, "there [was] no
13  dialogue."  "[U]ntil the receipt of the [CRL], we had no dialogue whatsoever with the agency.
14  Until the day before the CRL, we had a dialogue with some senior management present, but not
15  anybody on the review team, and then the very next day, we receive the CRL."

16  160.   Despite this groundbreaking new information and subsequent silence from the
17  FDA, Defendants acted like it was business as usual.  On June 24, 2020, for example, Defendant
18  Fuchs presented at the Bank of America Securities Napa Biopharma Conference on behalf of
19  BioMarin.  During the presentation, Defendant Fuchs reaffirmed that "***we continue to anticipate***
20  ***approval of [Valrox] in the second half of this year based on the August 21 PDUFA action date***"
21  and that Valrox's approval "***remain[ed] on track***."

22  161.   Later on, Defendant Fuchs was asked if he could "comment at all if you still expect
23  to have an inspection in the first half of this year[?]"  Defendant Fuchs responded, "***Yes***, that's
24  going to, that's a good question to illuminate the thing that I said at the beginning, which is ***now***
25  ***that we're under two months away from PDUFA, I think our answer to these types of questions***
26  ***is going to be we're on track for our PDUFA [date of] 8/21/20***."

27  162.   Defendant Fuchs also emphasized Valrox's durability, stating:  "***hemostatic***
28  ***efficacy was maintained at all factor levels from the lowest patients to the highest patients . . .***

*[w]e're so pleased with the clinical benefit demonstrated with [Valrox] that it continues to be durable at the four years and counting*." Defendant Fuchs went on to explain that the "*hemostatic efficacy even at low factor level statement under – and some level doesn't do enough justice to the profundity of the clinical benefit that, that patient – those patients who are even in that [lower factor] range, still experiencing profound benefits many years later. And those are our lowest patients. And so I think that's a pretty comforting thing is to think about the fact that the expectations for a clinical benefit are really, can be fairly large*."

163. With the August 21 PDUFA date fast approaching – and Defendants' fraud about to be revealed – Defendants Fuchs seized upon BioMarin's inflated stock price to offload *tens of millions of dollars'* worth of stock.

164. Defendant Fuchs sold 23,011 shares of BioMarin common stock on July 13, 2020, and 126,389 shares of BioMarin common stock on July 20, 2020, for a total of *$19.5 million*. A few months earlier, on April 20, 2020, and April 24, 2020, Defendant Fuchs sold 17,213 shares of BioMarin common stock and 20,000 shares of BioMarin common stock, respectively. All told, between March and August 2020, *Defendant Fuchs sold 64% of his BioMarin holdings for nearly $23 million.*

165. Each of these sales was made pursuant to a 10b5-1 plan executed on March 11, 2020, *after* the FDA had already informed BioMarin that its inspection of the Novato facility would likely be delayed beyond the second quarter of 2020, thus making the Agency's approval of Valrox by the August 21 PDUFA date highly unlikely.

166. Defendant Fuchs' sales were highly unusual. Indeed, between September 2019 and February 2020 – the six months immediately preceding the relevant period – Defendant Fuchs did not sell a single share of BioMarin common stock.

167. Defendant Bienaimé did the same. Defendant Bienaimé sold 10,000 shares of BioMarin common stock on March 9, 2020, 10,000 shares of BioMarin common stock on April 9, 2020, 20,000 shares of BioMarin common stock on April 27, 2020, 20,000 shares of BioMarin common stock on April 28, 2020, 4,000 shares of BioMarin common stock on May 1, 2020, 5,000 shares of BioMarin common stock on May 4, 2020, and 20,000 shares of BioMarin common stock

on May 8, 2020.  Overall, Defendant Bienaimé sold 89,000 shares of BioMarin common stock – 23% of his BioMarin holdings – ***for more than $8.2 million***.  Between September 2019 and February 2020 – the six months immediately preceding the relevant period – Defendant Bienaimé sold approximately half that amount for less than $4 million.

168.    On August 4, 2020, BioMarin announced its financial results for the second quarter of 2020.  In the press release, BioMarin reaffirmed that the "***FDA review of the BLA, under Priority Review, for [Valrox] is on-track with a PDUFA target action date of August 21, 2020.***"  Defendant Bienaimé further stated in the press release that "***[w]ith the outcome of the Priority Review of our BLA anticipated August 21, 2020, our commercial team is preparing to launch what we believe is the most innovative product yet for bleeding disorders***."

169.    On August 13, 2020, Defendant Fuchs presented at the Canaccord Genuity Growth Conference on behalf of BioMarin.  During the presentation, Canaccord Genuity analyst Michelle Gilson asked Defendant Fuchs about the "competitive dynamics" BioMarin would face when launching Valrox and "what advantage does, I guess, the [Valrox] complete data package provide for when you're going out and marketing this drug?"  Defendant Fuchs once again dismissed BioMarin's competitors, stating "[Valrox] is a generation one gene therapy.  So Spark and Sangamo are generation 0.6 and 0.3, maybe even a higher degree of discount just ***because they're so far behind***."

## IX.    The FDA Refuses to Approve Valrox As Two Years of Clinical Trial Data Cast Further Doubt on the Drug's Durability

170.    The market began to learn the truth about the FDA's review of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures on August 19, 2020.  Before the market opened, BioMarin announced that the FDA had issued a CRL regarding Valrox indicating that "the review cycle for [its BLA] application [was] complete and that the application [was] not ready for approval in its present form."

171.    According to BioMarin, the "FDA concluded that the differences between Study 270-201 (Phase 1/2) and the Phase 3 study limited its ability to rely on the Phase 1/2 Study to support durability of effect."  The FDA therefore "introduced a new recommendation for two years

SHARTSIS FRIESE LLP

of data from the Company's ongoing 270-301 study (Phase 3) to provide substantial evidence of a durable effect using the Annualized Bleeding Rate (ABR) as the primary endpoint." The FDA "recommended that the Company complete the Phase 3 Study and submit two-year follow-up safety and efficacy data on all study participants." The Phase 3 study was fully enrolled in November 2019, so the last patient would not complete two years of follow-up until November 2021.

172. BioMarin's stock *plummeted more than 35%* in response to this news, from a closing price of $118.54 per share on August 18, 2020, to a closing price of $76.72 per share on August 19, 2020. As investors continued to process the news about the CRL, BioMarin's stock price slid even lower, bottoming out at a closing price of $74.85 on August 20, 2020. All told, BioMarin's stock declined nearly *37%* between August 18, 2020, and August 20, 2020.

173. Analysts and investors were dumbfounded by the CRL. In an August 19, 2020 report, for example, RBC Capital Markets described the CRL as a "*massive surprise*," particularly in light of BioMarin's recent "*positive commentary on regulatory process*." The report went on to opine that there was now "limited upside [in BioMarin] given that there could be *mgmt credibility concerns*."

174. Piper Sandler similarly wrote that the CRL was a "*major surprise*" and that they were "*shocked by this development as management, as recently as last week during our virtual West Coast bus tour, was uber bullish regarding [Valrox's] commercial prospects*."

175. J.P. Morgan questioned whether Defendants had been truthful and fully transparent with investors, noting that "[u]nder [breakthrough therapy designation], *we would assume that [BioMarin] would have been aware of this data deficiency well before the week of the [August 21 PDUFA date]*."

176. Beyond the sheer fact of the CRL, BioMarin's description of it and what was needed to obtain FDA approval cast serious doubts on Defendants' prior representations. For example, the fact that the FDA introduced a "new recommendation" in the CRL that had not been addressed "at any time during development or review" raised questions about how closely BioMarin had been working with the FDA during the review process. And the fact that BioMarin

- 40 -

SHARTSIS FRIESE LLP

1
2
3
4

"planned to meet with the [FDA] in the coming weeks to align on the next steps to obtain approval" raised questions about when the Company's last meeting with the FDA was and why, given their purported close and collaborative relationship, weeks were necessary to "align on the next steps" for approval.

5
6
7
8
9
10
11

177.    *Evaluate Vantage*, a website offering data-driven news and analysis on pharma, biotech, and medtech companies, picked up on this point, writing "[t]he problem of Valrox's waning efficacy has been rumbling for some time . . . [g]ene therapy players are making a case for premium pricing – $2-3m per Valrox dose has been mooted – logic that would be destroyed if such a therapy were not, after all, a 'once and done' procedure.  As such, BioMarin's claim that the [FDA] had moved the goalposts in demanding long-term data before approving Valrox . . . ***rings hollow***."

12
13
14
15
16
17
18
19

178.    Like analysts, various news outlets and trade publications also directly linked the fall in BioMarin's stock price to the Company's announcement of the CRL.  *The Motley Fool*, a website providing stock investing and stock market research, wrote that "[s]hares of [BioMarin] are down 35% at 1:41 p.m. EDT because the [FDA] issued a [CRL] for the biotech's hemophilia A gene therapy, [Valrox]."  *Reuters* drew the same connection between the fall in BioMarin's stock price and the "surprising" CRL, as did *CBS News*, which wrote "[s]hares of drugmaker BioMarin plunged 35% after federal regulators rejected the company's potentially game-changing hemophilia A gene therapy over concerns it might not really be a one-and-done treatment."

20
21
22
23
24
25

179.    In the coming weeks, investors and analysts pressed Defendants for the FDA's rationale in issuing the CRL and refusing to approve Valrox.  On September 16, 2020, for example, in response to a question from Cantor Fitzgerald analyst Eliana Merle, Defendant Fuchs explained: "what they told us was that the differences in the Factor VIII expression at weeks 23 to 26 between the Phase 2 and Phase 3 study precluded them from demonstrating a threshold level above which you need to be to achieve bleeding.  So that's what they said was the underlying mechanism."

26
27
28

180.    Defendant Fuchs likewise stated on November 16, 2020, "[w]hen we got the CRL, we conveyed what was the substantial element of the CRL, which was that the difference in the 2 trials, the Phase 2 and the Phase 3 trial resulted in differences in Factor VIII activity at an initial

SHARTSIS FRIESE LLP

time point.  And because of other differences in the trial, how they were conducted, the starting

materials for the Phase 1/2 trial versus the Phase 3 trial and the use of corticosteroids."

181.    Given the FDA's recommendation that BioMarin submit additional data from the

Phase 3 clinical trial to demonstrate Valrox's durability, the Company announced further results

on Sunday, January 10, 2021:

| Median Factor VIII Activity, IU/dL | Phase 3 Rollover Population (N=112) Mean (SD) Median | Phase 3 mITT Subset Population (N=17*) Mean (SD) Median | Phase 1/2 6e13 vg/kg Cohort (N=7) Mean (SD) Median |
|---|---|---|---|
| Week 26 | 55.1 (57.4) 38.6 | 43.9 (42.1) 33.8 | 71.0 (41.6) 61.2 |
| Week 52 | 43.6 (45.3) 24.2 | 42.2 (50.9) 23.9 | 63.6 (36.5) 60.3 |
| Week 76 | | 27.9 (30.6) 15.8 | 53.9 (31.2) 50.2 |
| Week 104 | | 24.4 (29.2) 14.7 | 36.4 (26.3) 26.2 |

182.    Of the 134 patients now in the Phase 3 clinical trial, 17 had received a Valrox

infusion at least two years prior to the data cutoff date.  Those 17 patients had mean and median

Factor VIII levels of 42% and 24% respectively, one year after infusion.  Two years after infusion,

the patients' mean and median Factor VIII level had dropped to 24% and 15%, respectively.

Comparatively, the patients in the Phase 1/2 clinical trial had mean and median Factor VIII levels

of 64% and 60%, respectively, one year after infusion, and 36% and 26%, respectively, two years

after infusion.

183.    112 additional patients in the Phase 3 clinical trial had received a Valrox infusion

Case No.                          COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

at least one year prior to the data cutoff date. Those 112 patients had similar mean and median Factor VIII levels of 44% and 24%, respectively, one year after infusion.

184.    BioMarin's stock declined *nearly 10%* on this news, from a closing price of $89.86 per share on January 8, 2021, to a closing price of $81.24 per share on January 11, 2021.

185.    *Bloomberg* directly linked the fall in BioMarin's stock price to the additional clinical results released on January 10, 2021, writing "[BioMarin] shares dropped nearly 10% Monday after gene-therapy results in hemophilia A fueled doubts about the likelihood of a near-term approval."

186.    Given the additional results from the Phase 3 clinical trial, Piper Sandler acknowledged that "the uber-aggressive timeline we had mused about [for Valrox's approval] appears off the table."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### I.    Defendants' False and Misleading Statements about the FDA's Approval of Valrox

187.    On March 3, 2020, Defendant Bienaimé presented at the Cowen Annual Healthcare Conference on behalf of BioMarin. During his presentation, Defendant Bienaimé announced to investors that Valrox's BLA had been accepted under Priority Review and that the FDA had set a PDUFA date of August 21, 2020. Defendant Bienaimé further stated that BioMarin "***anticipate[d] launching in the second half of [2020]***."

188.    In response to a question from Cowen analyst Phil Nadeau about whether there were "any areas of major disagreement between BioMarin and the [FDA], whether its in clinical data, clinical trial design or manufacturing?" Defendant Bienaimé stated: "[s]o since we have had breakthrough – we had breakthrough therapy designation, accelerated filing, priority review ***we had a lot of interaction with the FDA over the past few years.*** And I would say on the clinical front, as of today, I'm not aware of any substantial discussion going on in the [Chemistry, Manufacturing, and Controls] front. There are some discussions, but ***we have been cooperating very closely with the FDA over the past three years***. Actually, when we designed this manufacturing facility we interacted with them. ***We've been interacting with them very closely*** on the development of in-process assay or release assay. ***So we believe [we have a] very good***

SHARTSIS FRIESE LLP

1    *relationship with them*."

2        189.    As the Court has already found in denying Defendants' motion to dismiss in the

3    Class Action, Defendant Bienaimé's statements (and other substantively identical statements)

4    were materially false and misleading and omitted to state material facts.  It was materially

5    misleading for Defendant Bienaimé to emphasize BioMarin's close relationship with the FDA

6    while failing to disclose that the Agency had already informed BioMarin that its on-site inspection

7    of the Novato facility would likely be delayed beyond the second quarter of 2020.  Indeed, as the

8    Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements

9    regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were

10   presented as the truth of the situation.  Nor are they just empty optimism:  If it is true that BioMarin

11   had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue."

12   It was also materially misleading for Defendant Bienaimé to tell investors that BioMarin

13   anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the

14   FDA would approve Valrox by the August 21 PDUFA date given its inability to inspect the Novato

15   facility in the second quarter of 2020.  As the Court found in denying Defendants' motion to

16   dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined

17   with a delay in the important inspection combined with an unusual period of silence from the FDA

18   would raise "*serious doubts* about . . . prompt FDA approval."

19       190.    On April 29, 2020, BioMarin held the 1Q2020 Earnings Call.  During the call,

20   SunTrust analyst Robyn Karnauskas asked Defendants "what gives you confidence that . . . there

21   won't be any more delays" in Valrox's approval?  Defendant Fuchs responded:  "*[t]he confidence*

22   *from the FDA is that we're tracking to our milestones.  And in some cases, they are accelerating*

23   *their work.  So having been through a bunch of these recently, all the signs are pointing*

24   *favorably*."  Defendant Fuchs further stated that "*the FDA is committed to meet the August*

25   *PDUFA action date*."

26       191.    As the Court has already found in denying Defendants' motion to dismiss in the

27   Class Action, Defendant Fuchs' statements (and other substantively identical statements) were

28   materially false and misleading and omitted to state material facts.  It was materially misleading

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

for Defendant Bienaimé to emphasize BioMarin's close relationship with the FDA while failing to disclose that the Agency had already informed BioMarin that its on-site inspection of the Novato facility would likely be delayed beyond the second quarter of 2020.  Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were presented as the truth of the situation.  Nor are they just empty optimism:  If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue."  It was also materially misleading for Defendant Fuchs to tell investors that BioMarin was tracking to its milestones and that the FDA was committed to meeting the August 21 PDUFA date when, in fact, the opposite was true.  The FDA had already informed BioMarin that its on-site inspection of the Novato facility would likely be delayed beyond the second quarter of 2020, making it extremely unlikely that the Agency would approve Valrox by the August 21 PDUFA date.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'"  The Court likewise found in denying Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."

192.    A few weeks later, on May 14, 2020, Defendants Bienaimé and Fuchs presented at the Bank of America Global Research Health Care Conference on behalf of BioMarin.  During the presentation, Bank of America analyst Geoffrey Meacham asked Defendants Bienaimé and Fuchs about Valrox's "launch in the context of social distancing [and] telemedicine?"  Defendant Bienaimé responded that BioMarin had "***done a lot of meetings with, of course, regulatory authorities, we are doing a lot of interactions . . . nobody [is] concerned about launching it in this situation [but] at the same time, we're not launching the drug today, PDUFA date is late August, so we'[ll] likely be launching in early September in the U.S.***"

193.    Meacham then asked Defendants Bienaimé and Fuchs "where you are with respect

to [Chemistry, Manufacturing, and Controls]?  And, from a manufacturing perspective, what gives you the confidence in the ultimate outcome here with respect to an inspection?  Maybe just help us with . . . the inspection and the manufacturing facility?"

194.    Defendant Bienaimé responded that "*the inspection by the FDA is scheduled significantly before the PDUFA date.  So, we are on track in this respect.  I would say what makes us confident [is] . . . based on all of our interactions we've had over the past 3 years or so, interacting with the FDA as we were building the plant, validating the plant, makes us already be confident that we're going to be in a good position with the FDA inspection*."  Defendant Fuchs went on to state that "*we're pretty close to the finish line at this point*."

195.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Bienaimé's and Defendant Fuchs' statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts.  It was materially misleading for Defendant Bienaimé to emphasize BioMarin's close relationship with the FDA while failing to disclose that there had been – by Defendants' own admission – "no dialogue whatsoever" with the Agency for a month.  Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were presented as the truth of the situation.  Nor are they just empty optimism:  If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue."  It was also materially misleading for Defendant Bienaimé to tell investors that the FDA's on-site inspection of the Novato facility was on track when, in reality, the Agency had already informed BioMarin that its on-site inspection of the Novato facility would likely be delayed beyond the second quarter of 2020.  It was also materially misleading for Defendant Bienaimé to tell investors that BioMarin anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its month-long silence and inability to inspect the Novato facility in the second quarter of 2020.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period

SHARTSIS FRIESE LLP

of silence from the FDA would raise "*serious doubts* about . . . prompt FDA approval."

196.    A few days later, on May 19, 2020, Defendant Fuchs presented at the RBC Capital Markets Global Healthcare Conference on behalf of BioMarin.    During the presentation, Defendant Fuchs stated that, **"[o]n the horizon later this year, we're looking forward to the potential approval of [Valrox] for the treatment of hemophilia A, our PDUFA action date of August 21 is holding firm.  In spite of the pandemic, everything is going quite well, in review with the FDA**."

197.    Later on in the presentation, Defendant Fuchs stated that BioMarin was "**on track in the PDUFA action cycle and feeling good about where we are**" and that the Company was in a "**late-stage regulatory process**" with Valrox.

198.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Fuchs' statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts.  It was materially misleading for Defendant Fuchs to tell investors that the FDA's review was going quite well while failing to disclose that there had been – by Defendants' own admission – "no dialogue whatsoever" with the Agency for a month.  Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were presented as the truth of the situation.  Nor are they just empty optimism:  If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue."  It was also materially misleading for Defendant Fuchs to tell investors that BioMarin was on track in the FDA review cycle and that the August 21 PDUFA date was holding firm when, in fact, the opposite was true.  The FDA had already informed BioMarin that its on-site inspection of the Novato facility would likely be delayed beyond the second quarter of 2020, making it extremely unlike that the Agency would approve Valrox by the August 21 PDUFA date.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'"  The Court likewise found in denying

SHARTSIS FRIESE LLP

1

2

3

Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."

4

5

6

199.    On May 31, 2020, BioMarin announced that the "***inspection of the [Novato] facility by [the] FDA is expected to be complete during the second quarter [of 2020], which would allow for potential licensure of the facility in the U.S. consistent with the August 21 PDUFA date***."

7

8

9

10

11

12

13

14

15

16

200.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, BioMarin's statement was materially false and misleading and omitted to state material facts.  It was materially misleading for BioMarin to tell investors that the on-site inspection of the Novato facility would occur in the second quarter of 2020 when, in fact, the opposite was true.  The FDA had already informed BioMarin that its on-site inspection of the Novato facility would likely be delayed beyond the second quarter of 2020, making it extremely unlikely that the Agency would approve Valrox by the August 21 PDUFA date.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "the FDA warned BioMarin of th[e] exact danger" that its on-site inspection of the Novato facility would be delayed, making BioMarin's statements to the contrary misleading.

17

18

19

20

21

201.    On June 4, 2020, Defendants Bienaimé and Fuchs presented at the Jefferies Global Healthcare Conference on behalf of BioMarin.  During the presentation, Defendant Bienaimé told investors that "***[w]e anticipate the US approval of [Valrox], the first ever gene therapy treatment in any hemophilia indication, in the second half of this year based on our August 21 PDUFA date with the FDA***."

22

23

24

25

202.    Jefferies analyst Eun Yang then asked Defendants Bienaimé and Fuchs about the inspection of BioMarin's Novato facility, stating:  "[y]ou also mentioned that [BioMarin is] on track for [the] FDA's inspection in the second quarter, and we have less than a month left.  So has a date been set up?"

26

27

28

203.    Defendant Fuchs responded:  "***Yes.  We have a schedule.  And in fact, the agency has been quite collaborative.***  Inspections are part document review and part inspection onsite.  So they accommodated a suggestion that we made, which was to start the document review

Case No.                                    COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

already. So we shipped them a whole bunch of documents, and they've begun their reviews. And I think that will make their on-site inspection just that much more efficient. Now, we have to pay attention to travel and stuff like that. ***And our working belief and the agency has signaled strongly that they intend to maintain their PDUFA action date. And so far, the kind of flexibility we've seen from the agency would suggest that whatever problems they experienced are going to work around***."

204. As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Bienaimé's and Defendant Fuchs' statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts. It was materially misleading for Defendant Fuchs to tell investors that BioMarin was working quite collaboratively with the FDA while failing to disclose that there had been – by Defendants' own admission – "no dialogue whatsoever" with the Agency for months. Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were presented as the truth of the situation. Nor are they just empty optimism: If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue." It was also materially misleading for Defendant Bienaimé and Defendant Fuchs to tell investors that the FDA was maintaining the August 21 PDUFA date and that BioMarin anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its months-long silence and inability to inspect the Novato facility in the second quarter of 2020. As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'" The Court likewise found in denying Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."

205. On June 9, 2020, Defendants Bienaimé and Fuchs presented at the Goldman Sachs

Annual Healthcare Conference on behalf of BioMarin.  During the presentation, Defendant Bienaimé again stated that "*[w]e continue to anticipate the U.S. approval of [Valrox] in the second half of the year based on our August 21 PDUFA action date*."

206.    Goldman Sachs analyst Salveen Richter then asked Defendants Bienaimé and Fuchs "as you near this August 21 PDUFA date, could you comment on what gating factors are - - still are there ahead of the PDUFA and commercialization?  With regard to the [Novato] facility, we know its pending FDA inspection.  So are there any alternative ways, I guess, for the FDA to certify that plant via virtual means?"

207.    In response, Defendant Fuchs stated:  "Well we're in the middle of a mesh with the FDA.  Any given day, it's like back and forth.  *But what I would say is that in regards to major metrics, the agency is actually ahead of their PDUFA mandated regulatory metrics in terms of timeline*.  So really, what remains are inspections and completion of reviews.  They have all the information on file that they need to complete their reviews.  *And so we're working very closely with them to keep things on track.  . . . So we continue the collaboration*."

208.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Bienaimé's and Defendant Fuchs' statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts.  It was materially misleading for Defendant Fuchs to tell investors that BioMarin was working closely and collaboratively with the FDA while failing to disclose that there had been – by Defendants' own admission – "no dialogue whatsoever" with the Agency for months.  Indeed, as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding BioMarin's relationship with the FDA "were not presented only as beliefs, they were presented as the truth of the situation.  Nor are they just empty optimism:  If it is true that BioMarin had reason to doubt the timeline and had not communicated with the FDA, they are simply untrue." It was also materially misleading for Defendant Bienaimé and Defendant Fuchs to tell investors that the FDA was on track and ahead of their deadlines and that BioMarin anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its months-long silence and inability to inspect the

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

Novato facility in the second quarter of 2020.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'"  The Court likewise found in denying Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."

209.    On June 24, 2020, Defendant Fuchs presented at the Bank of America Securities Napa Biopharma Conference on behalf of BioMarin.  During the presentation, Defendant Fuchs stated "*we continue to anticipate approval of [Valrox] in the second half of this year based on the August 21 PDUFA action date*" and that Valrox's approval "*remain[ed] on track*."

210.    Later on, Defendant Fuchs was asked if he could "comment at all if you still expect to have an inspection in the first half of this year[?]"  Defendant Fuchs responded, "*Yes*, that's going to, that's a good question to illuminate the thing that I said at the beginning, which is *now that we're under two months away from PDUFA, I think our answer to these types of questions is going to be we're on track for our PDUFA [date of] 8/21/20*."

211.    Defendant Fuchs also told investors that "*hemostatic efficacy was maintained at all factor levels from the lowest patients to the highest patients . . . [w]e're so pleased with the clinical benefit demonstrated with [Valrox] that it continues to be durable at the four years and counting*."  He went on to explain that the "*hemostatic efficacy even at low factor level statement under – and some level doesn't do enough justice to the profundity of the clinical benefit that, that patient – those patients who are even in that [lower factor] range, still experiencing profound benefits many years later.  And those are our lowest patients.  And so I think that's a pretty comforting thing is to think about the fact that the expectations for a clinical benefit are really, can be fairly large*."

212.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Fuchs' statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts.  It was materially misleading

for Defendant Fuchs to tell investors that Valrox's approval and the PDUFA date were on track and that BioMarin anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given that it had cancelled its on-site inspection of the Novato facility.  As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'"  The Court likewise found in denying Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."  It was also materially misleading for Defendant Fuchs to emphasize Valrox's durability when there were significant and worrying discrepancies between the data in the Phase 1/2 and Phase 3 clinical trials.  In fact, the FDA had pointed out these discrepancies during the late-cycle meeting just days earlier, noting that it would be unable to establish the required threshold for Valrox's effectiveness and durability as a result.

213.    On August 4, 2020, BioMarin announced its financial results for the second quarter of 2020.  In the press release, BioMarin reaffirmed that the "***FDA review of the BLA, under Priority Review, for [Valrox] is on-track with a PDUFA target action date of August 21, 2020.***"  Defendant Bienaimé further stated in the press release that "***[w]ith the outcome of the Priority Review of our BLA anticipated August 21, 2020, our commercial team is preparing to launch what we believe is the most innovative product yet for bleeding disorders***."

214.    As the Court has already found in denying Defendants' motion to dismiss in the Class Action, BioMarin's and Defendant Bienaimé's statements (and other substantively identical statements) were materially false and misleading and omitted to state material facts.  It was materially misleading for BioMarin and Defendant Bienaimé to tell investors that the PDUFA date was on track and that BioMarin anticipated launching Valrox in the second half of 2020 when it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its months-long silence and inability to inspect the Novato facility in the second quarter of 2020.

SHARTSIS FRIESE LLP

As the Court found in denying Defendants' motion to dismiss in the Class Action, "it is plausible that the concerns about the Phase III data combined with a delay in the important inspection combined with an unusual period of silence from the FDA would raise '*serious doubts* about . . . prompt FDA approval.'"  The Court likewise found in denying Defendants' motion to dismiss in the Class Action that Defendants' statements about the PDUFA date were misleading "because BioMarin was allegedly aware of concrete risks that approval would be denied even as it projected that it would be granted."

215.   On August 13, 2020, Defendant Fuchs presented at the Canaccord Genuity Growth Conference on behalf of BioMarin.  During the presentation, Canaccord Genuity analyst Michelle Gilson asked Defendant Fuchs about the "competitive dynamics" BioMarin would face when launching Valrox and "what advantage does, I guess, the [Valrox] complete data package provide for when you're going out and marketing this drug?"  Defendant Fuchs dismissed BioMarin's competitors, stating "[Valrox] is a generation one gene therapy.  So Spark and Sangamo are generation 0.6 and 0.3, maybe even a higher degree of discount just *because they're so far behind*."

216.   As the Court has already found in denying Defendants' motion to dismiss in the Class Action, Defendant Fuchs' statement was materially false and misleading and omitted to state material facts.  It was materially misleading for Defendant Fuchs to downplay the threat posed by competing gene therapies when BioMarin was no closer than its competitors to receiving FDA approval.  Indeed, it was highly unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its months-long silence and inability to inspect the Novato facility in the second quarter of 2020.

## II.   Defendants' False and Misleading Statements About the Effectiveness of BioMarin's Internal Disclosure Controls and Procedures

217.   Throughout the relevant period, Defendants repeatedly and falsely certified to investors that they had established effective internal disclosure controls and procedures for the Company.

218.   In the 1Q2020 10-Q, for example, BioMarin stated:

> An evaluation was carried out, under the supervision of and with the participation of our management, including our Chief Executive Officer and our Acting Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)), as of the end of the period covered by this report.
>
> ***Based on the evaluation, our Chief Executive Officer and our Acting Chief Financial Officer have concluded that our disclosure controls and procedures were effective*** . . . .

219.    BioMarin made substantively identical disclosures in the 2Q2020 10-Q and 3Q2020 10-Q.

220.    Along with the 1Q2020 10-Q, 2Q2020 10-Q, and 3Q2020 10-Q, Defendant Bienaimé provided a certification concerning BioMarin's internal disclosure controls and procedures pursuant to Section 302 of SOX.  In those certifications, Defendant Bienaimé stated:

1.    I have reviewed this Quarterly Report on Form 10-Q of BioMarin Pharmaceutical Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

. . .

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

. . .

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's

- 54 -

Case No.                     COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .

221.    These statements were materially false and misleading and omitted to state material facts.  It was materially misleading for Defendants to represent that BioMarin's internal disclosure controls and procedures were effective during the relevant period when that was not the case and Defendants Bienaimé and Fuchs had repeatedly and successfully evaded those controls to perpetrate their fraud.  Among other things, Defendants knew but failed to inform investors that it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date given its months-long silence, the delay and ultimate cancellation of its on-site inspection of the Novato facility, and the Agency's stated concerns regarding Valrox's durability.   To the contrary, Defendants told investors that the FDA's review remained on track and that it anticipated launching Valrox in the second half of 2020.  Defendants also knew that the FDA's on-site inspection of the Novato facility would not take place in the second quarter of 2020, but told investors the precise opposite.

## SUMMARY OF DEFENDANTS' SCIENTER

222.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

223.    Defendants Bienaimé and Fuchs acted with scienter with respect to the materially false and misleading misstatements and omissions of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made.  As BioMarin's senior executives during the relevant period, their scienter is imputable to BioMarin.

224.    As the Court found in denying Defendants' motion to dismiss in the Class Action, "defendants allegedly told the market things that were allegedly not true and that it must have known were not true by their nature. . . . [T]he defendants here repeatedly told the market that they had high confidence in approval on the set timeline and had a good relationship with the FDA when in fact there were allegedly concrete warning signs otherwise and silence from the FDA.  Still more, the defendants made statements later that, at least as alleged, contradict the statements

they made during the [relevant period]. After [the relevant period] Fuchs admitted that BioMarin had 'no dialogue' with the FDA. The defendants admitted that the FDA had concerns about the Phase III data. And . . . a confidential witness stated that the company was aware that approval was riskier than they let on publicly." As the Court noted, Defendants' admissions make clear that they had information indicating that it was extremely unlikely that the FDA would approve Valrox by the August 21 PDUFA date yet told investors the precise opposite. The FDA delayed – and then cancelled – its on-site inspection of the Novato facility, making its approval of the drug impossible. In the late-cycle meeting, the FDA also pointed out discrepancies between the data in the Phase 1/2 and Phase 3 clinical trials and noted that it would be unable to establish the required threshold for Valrox's effectiveness and durability as a result. At the same time, the FDA cut off all communication with BioMarin, save for the mandated mid-cycle and late-cycle meetings. As Defendants have since admitted, BioMarin had "no dialogue whatsoever" with the Agency for months, yet told investors that the Company was working closely and collaboratively with the Agency during its review. Thus, just as Defendants were assuring investors that Valrox would be approved by the August 21 PDUFA deadline, they were in possession of facts indicating the opposite.

225.    Additionally, as the Court found in denying Defendants' motion to dismiss in the Class Action, "it is notable that Valrox was going to be a significant and lucrative product and that two drugs that made up about one-third of BioMarin's revenue were about to end their exclusivity periods." Kuvan and Vimizim were BioMarin's highest grossing products and accounted for approximately 28% and 33%, respectively, of the Company's net product revenue in 2019. But Vimizim's exclusivity period was soon ending, and other pharmaceutical companies were set to begin marketing and selling generic versions of Kuvan as early as the fourth quarter of 2020. With a price tag of between $2 million and $3 million per infusion, Valrox would be the most expensive drug in the world and transformative for BioMarin. Defendant Fuchs said as much in June 2019, remarking that, if even 3,000 of 117,000 eligible patients received a Valrox infusion the first year the drug was approved, that would be "almost twice the revenue [BioMarin] was currently experiencing. And so the demand size, the value that Valrox represents is really substantial and

SHARTSIS FRIESE LLP

transformative for BioMarin." Because of this, Defendants Bienaimé and Fuchs were laser-focused on Valrox and mentioned it during every investor conference and on every investor call during the relevant period, and in the months leading up to the submission of the BLA. During these investor conferences and calls, Defendants Bienaimé and Fuchs were peppered with questions about Valrox and the FDA's review by investors and analysts, and thus knew that the drug was hugely significant to the market as well as to the Company.

226.    Additionally, Defendant Bienaimé's and Fuchs' stock sales provide further evidence of scienter. As the Court found in denying Defendants' motion to dismiss in the Class Action, "defendants' sale of stock helps contribute to an inference of scienter. . . . At the least, it contributes to the inference that defendants knew that they were withholding material information." Defendants Bienaimé and Fuchs sold large portions of their holdings of BioMarin common stock in the lead up to the August 21 PDUFA date. These sales netted Defendants Bienaimé and Fuchs more than $30 million and were highly unusual for Defendant Fuchs in particular. In the six months immediately preceding the relevant period, Defendant Fuchs did not sell a single share of BioMarin common stock. In fact, Defendant Fuchs' sales were made pursuant to a 10b5-1 plan executed on March 11, 2020, *after* the FDA had already informed BioMarin that its inspection of the Novato facility would likely be delayed beyond the second quarter of 2020, thus making the Agency's approval of Valrox by the August 21 PDUFA date highly unlikely. Delaying disclosure of negative news about the FDA's review of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures until after their stock sales benefitted Defendants Bienaimé and Fuchs enormously. Had Defendants Bienaimé and Fuchs sold their stock after the truth about their fraud began to be revealed, their profits would have been slashed as the price of BioMarin common stock dropped precipitously.

227.    BioMarin's May 19, 2020 debt offering provides an additional motive to commit fraud and is further evidence of Defendants' scienter. Delaying disclosure of negative news about the FDA's review of Valrox and the effectiveness of BioMarin's internal disclosure control and procedures allowed BioMarin to raise nearly $600 million on favorable terms. The debt offering was of paramount importance given the impact of the COVID-19 pandemic on BioMarin's revenue

and the fact that the Company had $375 million of convertible notes due in full in the fall of 2020. BioMarin would not have been able to refinance its maturing debt if Defendants had told the truth about Valrox.

## PLAINTIFFS' ACTUAL RELIANCE

228.    Plaintiffs are managed by Alger, a New York based investment adviser.

229.    Plaintiffs, through Alger, actually read or heard, reviewed, and justifiably relied on the representations set forth above prior to purchasing BioMarin common stock on the dates set forth in Exhibits A-P to the extent each such statement had been made at the time of purchase.

230.    Prior to purchasing BioMarin common stock on behalf of Plaintiffs, an analyst at Alger actually read or heard, reviewed, and justifiably relied on BioMarin's SEC filings as well as Defendants' other public disclosures, press releases, and investor presentations including, as applicable, Defendants' statements regarding the FDA's approval of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures.

231.    As Alger continued to purchase BioMarin common stock on behalf of Plaintiffs, an analyst at Alger kept abreast of publicly disclosed developments concerning BioMarin and, prior to purchasing BioMarin stock, actually read or heard, reviewed, and justifiably relied on BioMarin's SEC filings as well as Defendants' other public disclosures, press releases, and investor presentations including, as appliable, Defendants' statements regarding the FDA's approval of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures.

232.    Each of Defendants' statements was material to Alger's decision to purchase BioMarin common stock on behalf of Plaintiffs.

233.    Defendants' statements regarding the FDA's approval of Valrox were material to Alger's decision to purchase BioMarin common stock on behalf of Plaintiffs.  With nearly two thirds of BioMarin's revenue under significant and immediate threat from generic competition, Valrox had the potential to transform the Company.  As such, BioMarin was laser-focused on Valrox and Defendants Bienaimé and Fuchs mentioned it during every investor conference and on every investor call during the relevant period, and in the months leading up to the submission of

SHARTSIS FRIESE LLP

the BLA.  During these investor conferences and calls, Defendants Bienaimé and Fuchs were peppered with questions about Valrox and the FDA's review by investors and analysts and thus knew that the drug was hugely significant to the market as well as to the Company.

234.    As the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants' statements regarding the FDA's approval of Valrox "might be material to a reasonable investor who has been assured that approval and launch are on track because the 'total mix' of information would tilt much more against approval than without the information."

235.    Defendants' statements regarding the effectiveness of BioMarin's internal disclosure controls and procedures were also material because they assured investors that material information about BioMarin would be disclosed to investors, and that BioMarin was complying with disclosure laws.

236.    To the extent that each statement had been made at the time of purchase, Alger actually and justifiably relied on Defendants' statements regarding the FDA's approval of Valrox and the effectiveness of BioMarin's internal disclosure controls and procedures in making each purchase of BioMarin common stock on behalf of Plaintiffs, as set forth in Exhibits A-P.

237.    Plaintiffs' reliance on these statements of material fact was reasonable and justifiable.  Plaintiffs were open-market purchasers of BioMarin common stock that did so based on Defendants' representations.

238.    Had Alger known the truth, it would not have caused Plaintiffs to purchase BioMarin common stock or, if it had done so, would not have caused Plaintiffs to purchase at the prices they did.

## PRESUMPTION OF RELIANCE

239.    Plaintiffs also intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (1) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (2) the omissions and misrepresentations were material; (3) BioMarin common stock traded in an open and efficient market; (4) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of BioMarin common stock; and (5) Plaintiffs purchased or acquired

BioMarin common stock between the time when Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

240.    The market for BioMarin common stock was open, well-developed, and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, BioMarin common stock traded at artificially inflated prices during the relevant period.  The artificial inflation dissipated as the market learned of the nature and extent of Defendants' misrepresentations regarding the FDA's approval of Valrox and the ineffectiveness of BioMarin's internal disclosure controls and procedures.

241.    At all relevant times, the market for BioMarin common stock was efficient for the following reasons, among others: (1) BioMarin filed periodic reports with the SEC; (2) BioMarin common stock met the requirements for listing, was listed and actively and highly traded on the NASDAQ, a highly efficient market, during the time that Plaintiffs purchased or acquired BioMarin common stock; (3) numerous analysts followed BioMarin, each of which wrote reports that were publicly available and entered the public marketplace; and (4) BioMarin regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.  As a result, the market for BioMarin common stock promptly digested current information regarding BioMarin from all publicly available sources and such information was reflected in BioMarin's stock price.

242.    Plaintiffs relied on the market price of BioMarin common stock, which reflected all the information in the market, including the misstatements by Defendants.

243.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

Case No.                         COMPLAINT & DEMAND FOR JURY TRIAL

1

**LOSS CAUSATION**

2  244. As the truth about Defendants' fraud was gradually but only partially revealed to

3 the market, the price of BioMarin common stock plummeted and Plaintiffs suffered significant

4 investment losses.

5  245. Defendants' wrongful conduct, as alleged herein, directly and proximately caused

6 the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased BioMarin

7 common stock, as set forth in Exhibits A-P, the market price of that common stock was artificially

8 inflated as a direct result of Defendants' materially false and misleading statements.  Specifically,

9 Defendants' statements regarding the FDA's approval of Valrox and the effectiveness of

10 BioMarin's internal disclosure controls and procedures caused the price of BioMarin common

11 stock to be artificially inflated.

12  246. As a series of partial but inadequate disclosures were issued partially revealing the

13 false and misleading nature of Defendants' statements regarding the FDA's approval of Valrox

14 and the effectiveness of BioMarin's internal disclosure controls and procedures, and as the

15 foreseeable risks previously concealed by Defendants' material misrepresentations and omissions

16 partially materialized, the price of BioMarin common stock plummeted and Plaintiffs were

17 damaged.

18  247. On August 19, 2020, before the market opened, BioMarin announced that the FDA

19 had issued a CRL regarding Valrox indicating that "the review cycle for [its BLA] application

20 [was] complete and that the application [was] not ready for approval in its present form."

21 According to BioMarin, the "FDA concluded that the differences between Study 270-201 (Phase

22 1/2) and the Phase 3 study limited its ability to rely on the Phase 1/2 Study to support durability of

23 effect."  The FDA therefore "introduced a new recommendation for two years of data from the

24 Company's ongoing 270-301 study (Phase 3) to provide substantial evidence of a durable effect

25 using the Annualized Bleeding Rate (ABR) as the primary endpoint."  The FDA "recommended

26 that the Company complete the Phase 3 Study and submit two-year follow-up safety and efficacy

27 data on all study participants."  The Phase 3 study was fully enrolled in November 2019, so the

28 last patient would not complete two years of follow-up until November 2021.

Case No.     COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

248.    The CRL was a partial disclosure and partial materialization of the foreseeable risk that Defendants had previously concealed from the investing public.  Defendants reassured investors that BioMarin was working closely and collaboratively with the FDA and that the Agency's review was on track, including its on-site inspection of the Novato facility, such that Valrox would be launched in the second half of 2020.  More fundamentally, Defendants' assurances that the FDA's review was proceeding apace were intended to allay investors' concerns regarding Valrox's durability and the differences between the Phase 1/2 and Phase 3 clinical studies.  The CRL was a materialization of these previously concealed risks.  Valrox was not durable and, save for two mandatory meetings, BioMarin had absolutely no dialogue with the FDA before the CRL was issued.  In fact, the FDA had no communication with BioMarin for months at a time and cancelled its on-site inspection of the Novato facility.  And clearly, BioMarin's internal disclosure controls and procedures were ineffective given that Defendants were able conceal this information from investors while repeatedly assuring them that Valrox would be approved and launched in the second half of 2020.  Indeed, following BioMarin's disclosure of the CRL, analysts and news outlets raised serious concerns about management's credibility and remarked that the Company's statement that the FDA had "moved the goalposts" by introducing a new recommendation in the CRL "rings hollow."

249.    BioMarin's stock **plummeted more than 35%** in response to the news of the CRL, from a closing price of $118.54 per share on August 18, 2020, to a closing price of $76.72 per share on August 19, 2020.  As investors continued to process the news about the CRL, BioMarin's stock price slid even lower, bottoming out at a closing price of $74.85 on August 20, 2020.  All told, BioMarin's stock declined nearly **37%** between August 18, 2020, and August 20, 2020.  Analysts, news outlets, and trade publications all directly linked the fall in BioMarin's stock price to the Company's announcement of the CRL.  For example, *The Motley Fool* wrote that "[s]hares of [BioMarin] are down 35% at 1:41 p.m. EDT because the [FDA] issued a [CRL] for the biotech's hemophilia A gene therapy, [Valrox]."  *Reuters* drew the same connection between the fall in BioMarin's stock price and the "surprising" CLA, as did *CBS News*, which wrote "[s]hares of drugmaker BioMarin plunged 35% after federal regulators rejected the company's potentially

SHARTSIS FRIESE LLP

game-changing hemophilia A gene therapy over concerns it might not really be a one-and-done treatment."

250.    On Sunday, January 10, 2021, BioMarin announced additional results from the Phase 3 clinical study.  Of the 134 patients now in the Phase 3 clinical trial, 17 had received a Valrox infusion at least two years prior to the data cutoff date.  Those 17 patients had mean and median Factor VIII levels of 42% and 24% respectively, one year after infusion.  Two years after infusion, the patients' mean and median Factor VIII level had dropped to 24% and 15%, respectively.  Comparatively, the patients in the Phase 1/2 clinical trial had mean and median Factor VIII levels of 64% and 60%, respectively, one year after infusion, and 36% and 26%, respectively, two years after infusion.  112 additional patients in the Phase 3 clinical trial had received a Valrox infusion at least one year prior to the data cutoff date.  Those 112 patients had similar mean and median Factor VIII levels of 44% and 24%, respectively, one year after infusion.

251.    The additional results from the Phase 3 clinical study were a partial disclosure and partial materialization of the foreseeable risk that Defendants had previously concealed from the investing public.  Defendants assured investors that the FDA's review was proceeding apace in an effort to allay their concerns regarding Valrox's durability and the differences between the Phase 1/2 and Phase 3 clinical trials.  The additional results from the Phase 3 clinical study were a materialization of the previously concealed risk that Valrox was not in fact durable.

252.    BioMarin's stock declined ***nearly 10%*** on this news, from a closing price of $89.86 per share on January 8, 2021, to a closing price of $81.24 per share on January 11, 2021.  *Bloomberg* directly linked the fall in BioMarin's stock price to the additional clinical results released on January 10, 2021, writing "[BioMarin] shares dropped nearly 10% Monday after gene-therapy results in hemophilia A fueled doubts about the likelihood of a near-term approval."

253.    As Defendants acknowledged in an April 13, 2021 proxy statement filed with the SEC on Schedule 14A, "while we hope for the ultimate regulatory approval of [Valrox] for severe hemophilia A in both the U.S. and EU, ***the delay in the potential approval had a negative impact on our share price.***"

Case No.                    COMPLAINT & DEMAND FOR JURY TRIAL

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

## NO SAFE HARBOR

254.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BioMarin who knew that those statements were false when made.

255.    Indeed, in denying Defendants' motion to dismiss in the Class Action, the Court held that Defendants' misstatements were not protected by the statutory safe harbor for forward-looking statements because they were not accompanied by meaningful cautionary language and because it was plausible that Defendants made the misstatements with actual knowledge of their falsity.

## FIRST CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Against All Defendants

256.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

257.    This cause of action is brought against Defendants BioMarin, Bienaimé, and Fuchs for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

258.    Defendants BioMarin, Bienaimé, and Fuchs both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially

false and misleading statements alleged herein to: (1) deceive the investing public, including Plaintiffs, as alleged herein; (2) artificially inflate and maintain the market price of BioMarin common stock; and (3) cause Plaintiffs to purchase BioMarin common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants BioMarin, Bienaimé, and Fuchs took the actions set forth above.

259.    Defendants BioMarin, Bienaimé, and Fuchs both directly and indirectly: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of BioMarin common stock in an effort to artificially inflate and maintain the market prices for BioMarin common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

260.    By virtue of their high-level positions at BioMarin, Defendants Bienaimé and Fuchs were authorized to make public statements, and made public statements, on BioMarin's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of BioMarin's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

261.    In addition, Defendants BioMarin, Bienaimé, and Fuchs had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of BioMarin common stock would be based on truthful, complete, and accurate information.

262.    Defendants BioMarin, Bienaimé, and Fuchs acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants BioMarin's, Bienaimé's, and Fuchs' material misrepresentations and omissions were made knowingly and/or recklessly and had the effect of concealing the truth with respect to the FDA's approval of Valrox and the ineffectiveness of BioMarin's internal disclosure controls and

SHARTSIS FRIESE LLP

procedures. By concealing these material facts from investors, Defendants BioMarin, Bienaimé, and Fuchs supported the artificially inflated price of BioMarin common stock.

263. The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of BioMarin common stock. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which BioMarin's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiffs purchased BioMarin common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued and the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized, the price of BioMarin common stock substantially declined.

264. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the FDA's approval of Valrox and the ineffectiveness of BioMarin's internal disclosure controls and procedures, which were concealed by Defendants, Plaintiffs would not have purchased BioMarin common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

265. By virtue of the foregoing, Defendants BioMarin, Bienaimé, and Fuchs have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

266. As a direct and proximate result of Defendants BioMarin's, Bienaimé's, and Fuchs' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in BioMarin common stock.

267. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

SHARTSIS FRIESE LLP

**SECOND CAUSE OF ACTION**

**Violations of Section 20(a) of the Exchange Act**
**Against Defendants Bienaimé and Fuchs**

268.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

269.    This cause of action is brought against Defendants Bienaimé and Fuchs for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

270.    Each of Defendants Bienaimé and Fuchs was a controlling person of BioMarin within the meaning of Section 20(a) of the Exchange Act.

271.    By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, BioMarin's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC or disseminated to the investing public, Defendants Bienaimé and Fuchs had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

272.    Defendants Bienaimé and Fuchs were provided with or had unlimited access to copies of BioMarin's press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Bienaimé and Fuchs each had direct and supervisory involvement in the day-to-day operations of BioMarin and therefore are presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

273.    Defendants Bienaimé and Fuchs culpably participated in BioMarin's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

274.    By reason of the conduct alleged in the First Cause of Action, BioMarin is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Bienaimé and Fuchs are liable pursuant to Section 20(a) based on their control of BioMarin.

275.    Defendants Bienaimé and Fuchs are liable for the aforesaid wrongful conduct and

SHARTSIS FRIESE LLP

are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of BioMarin common stock.

276.    Taking into account, *inter alia*, the tolling of the limitations period by the filing of the complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### THIRD CAUSE OF ACTION
**Common Law Fraud**
**Against All Defendants**

277.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

278.    This cause of action is brought against Defendants BioMarin, Bienaimé, and Fuchs for violations of the common law.

279.    Defendants BioMarin, Bienaimé, and Fuchs made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to induce Plaintiffs to purchase BioMarin common stock.  Specifically, Defendants made numerous material misrepresentations or omitted material facts about FDA's approval of Valrox and the ineffectiveness of BioMarin's internal disclosure controls and procedures.

280.    Defendants BioMarin, Bienaimé, and Fuchs knew that their statements were false when made or omitted material facts or, at the very least, made the statements with reckless disregard for their truth.  As high-level executives at BioMarin, Defendant Bienaimé's and Fuchs' scienter is imputable to BioMarin.

281.    Defendants knew that investors like Plaintiffs would review and rely on such misrepresentations and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase BioMarin common stock at inflated prices.

282.    These statements were material to Plaintiffs and Plaintiffs actually, reasonably, and justifiably relied on them when purchasing BioMarin common stock.  At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the FDA's approval of Valrox and the

SHARTSIS FRIESE LLP

ineffectiveness of BioMarin's internal disclosure controls and procedures, which were concealed by Defendants, Plaintiffs would not have purchased BioMarin common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

283.    As a direct and proximate result of Defendants BioMarin's, Bienaimé's, and Fuchs' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in BioMarin common stock.

284.    Defendants BioMarin's, Bienaimé's, and Fuchs' wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

a.    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b.    Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful, and wanton conduct as detailed above;

c.    Awarding Plaintiffs their expenses, attorneys' fees, and costs; and

d.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

SHARTSIS FRIESE LLP

SHARTSIS FRIESE LLP

1  Dated:  February 23, 2023                    Respectfully submitted,

2                                               ALGER CAPITAL APPRECIATION FUND;
   ALGER MID CAP GROWTH FUND; ALGER
3                                               HEALTH SCIENCES FUND; ALGER SPECTRA
   FUND; ALGER DYNAMIC OPPORTUNITIES
4                                               FUND; ALGER CAPITAL APPRECIATION
   INSTITUTIONAL FUND; ALGER FOCUS
5                                               EQUITY FUND; ALGER MID CAP GROWTH
   INSTITUTIONAL FUND; ALGER CAPITAL
6                                               APPRECIATION PORTFOLIO; ALGER MIDCAP
   GROWTH PORTFOLIO; ALGER COLLECTIVE
7                                               TRUST SPECTRA SERIES; ALGER SICAV -
   ALGER DYNAMIC OPPORTUNITIES FUND;
8                                               ALGER SICAV - ALGER AMERICAN ASSET
   GROWTH FUND; ALGER SICAV - ALGER
9                                               FOCUS EQUITY FUND; ALGER CAPITAL
   APPRECIATION SERIES CIT; and ALGER
10                                              CAPITAL, LLC,

11

12                                                     */s/ Robert Charles Ward*

13                                              By:  _____
                                                         ROBERT CHARLES WARD
14

15                                              Lawrence M. Rolnick (*pro hac vice* forthcoming)
                                                Marc B. Kramer (*pro hac vice* forthcoming)
16                                              Michael J. Hampson (*pro hac vice* forthcoming)
                                                Nicole T. Castiglione (*pro hac vice* forthcoming)
17                                              ROLNICK KRAMER SADIGHI LLP
                                                1251 Avenue of the Americas
18                                              New York, New York 10020
                                                (212) 597-2800
19                                              lrolnick@rksllp.com
                                                mkramer@rksllp.com
20                                              mhampson@rksllp.com
                                                ncastiglione@rksllp.com

21

22

23

24

25

26

27

28

- 70 -

Case No.                          COMPLAINT & DEMAND FOR JURY TRIAL